**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Philip J. Duffy, Esq.
Telephone: (973) 596-4821
Facsimile: (973) 639-6219
E-mail: Pduffy@gibbonslaw.com
David N. Crapo, Esq.
Telephone: (973) 596-4523
Facsimile: (973) 639-6244
E-mail: Dcrapo@gibbonslaw.com

*Special Counsel for the Plaintiff,*
*The Great Atlantic & Pacific Tea Company, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, Inc., *et al.*,[1]<br><br>                   Debtors. | Chapter 11<br><br>Case No. 15-23007 (RDD)<br><br>(Jointly Administered) |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. *et al.*<br><br>             Plaintiff,<br><br>      v.<br><br>PEPSICO, INC; BOTTLING GROUP, LLC (d/b/a PEPSI BEVERAGES COMPANY and f/d/b/a | Adv. Proc. No. 18-08245 (RDD)<br><br><br>**SECOND AMENDED**<br>**ADVERSARY COMPLAINT** |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company, Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kwik Save Inc. (8636); McLean Avenue Plaza Corp. (5227); Montvale Holdings, Inc. (6664); Montvale-Para Holdings, Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge LLC (5965); Shopwell, Inc.(3304); Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5748); and Waldbaum, Inc. (8599). The international subsidiaries of The Great Atlantic & Pacific Tea Company, Inc. are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 19 Spear Road, Suite 310, Ramsey, New Jersey 07446.

2613717.1    032596-97802

THE PEPSI BOTTLING GROUP); FRITO-LAY
NORTH AMERICA, INC.; QUAKER SALES
AND DISTRIBUTION, INC.;  MULLER
QUAKER DAIRY, LLC; STACY'S PITA CHIP
COMPANY, INC.; PEPSI BOTTLING GROUP
NJ; and PEPSI USA,

Defendants.

Plaintiff The Great Atlantic & Pacific Tea Company, Inc. and its affiliated debtors (collectively, "GAPT" or "Debtors"), by its undersigned attorneys, hereby brings the following Second Amended Adversary Complaint against defendants Pepsico, Inc. ("PepsiCo"); Frito-Lay North America, Inc. ("Frito-Lay"); Bottling Group, LLC (d/b/a Pepsi Beverages Company and f/d/b/a The Pepsi Bottling Group) ("Bottling Group"); Quaker Sales and Distribution, Inc. ("Quaker Sales"); Muller Quaker Dairy, LLC ("Muller Quaker"); Stacy's Pita Chip Company, Inc. ("Stacy's"); Pepsi Bottling Group NJ ("Pepsi NJ"); and Pepsi USA, and avers as follows:

## PRELIMINARY STATEMENT

1.      GAPT has been a venerable supermarket grocery store chain in the United States, with stores located throughout much of the United States, including in the States of New York and New Jersey.  By April of 2015, the Debtors were facing substantial financial distress.    That distress gave way to bankruptcy filings by the Debtors.

2.      As their bankruptcy filings approached the Debtors continued operations.  They continued to purchase goods from Defendants Bottling Group and Frito-Lay (collectively, "Preference Defendants") — as they had done in the past.  Apparently sensing the financial distress in which the Debtors found themselves, however, and contrary to the policies underlying the Bankruptcy Code, the Preference Defendants pressed for quicker and quicker payment for goods

2

by GAPT, tightening credit terms at least twice during the run-up to the GAPT bankruptcy filings. The Preference Defendants' tactics worked; they received quicker, indeed preferential, payments from GAPT.  By this adversary proceeding, the Debtors now seek to recover those preferential payments on behalf of their bankruptcy estate.

3.     For many years, GAPT participated in Promotions (defined in ¶ 38 below) conducted by Defendants PepsiCo; Bottling Group, (including Pepsi NJ, Pepsi USA), Frito-Lay, Quaker Sales, Stacy's, and Muller Quaker (collectively, "Promotion Defendants").   Those Promotions continued during the run-up to the GAPT bankruptcy filing and after the filing until the last of the GAPT stores were closed.  Notwithstanding continued participation in those Promotions even after the bankruptcy filing and the commencement of a post-filing store-closing process, the Promotion Defendants have failed to pay GAPT the sum of $7,263,739.96 (less any offsets or credits to which they show themselves entitled) they owe with respect to Promotions.  By this adversary proceeding, GAPT now also seeks to recover the payments to which its participation in the Promotions entitles it.

## PARTIES

4.     Plaintiff The Great Atlantic & Pacific Tea Company, Inc. is a Maryland corporation with its principal offices located at 19 Spear Road, Suite 310, Ramsey, New Jersey 07446.

5.     On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors ("Committee"), pursuant to § 1102 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.) ("Bankruptcy Code").

6.     Pursuant to its Order (A) Approving Global Settlement Agreement and (B) Further Amending Debtors' Authority to Use Cash Collateral Pursuant to 11 U.S.C. § 105 and 363(c)(2)

2613717.1   032596-97802

(ECF No. 2868) ("Settlement Order") that approved a Global Settlement Agreement ("GSA") [2]

dated as of  May 16, 2016 between parties including the Debtors, the Committee and the Lenders,

the Court  authorized the Committee to prosecute Avoidance Actions on behalf of the Debtors'

estates, subject to the oversight and direction of  the Committee, Debtors and Lenders (collectively,

"Review Parties").  Settlement Order, at § 5.

7.    Neither the Settlement Order nor the GSA affords the Committee sole authority or

standing to litigate Avoidance Actions on behalf of the Debtors' estates, and neither the Settlement

Order nor the GSA impacts or limits the Debtors' authority and standing to prosecute contractual

claims on behalf of their bankruptcy estates.

8.    Because this adversary proceeding includes both Avoidance Action and contractual

claims against the Defendants, the Debtors have elected to prosecute this adversary proceeding

themselves.  Counsel for the Committee and the Lenders have consented to the Debtors'

prosecution of this adversary proceeding.

9.    Defendant PepsiCo is a corporation organized and existing under the laws of the

State of North Carolina with a principal place of business at 700 Anderson Hill Road in Purchase

New York.

10.    Defendant Bottling Group is a limited liability company organized and existing

under the laws of the State of Delaware with a principal place of business located at 1 Pepsi Way

in Somers, NY.  On information and belief, at all times relevant to the allegations contained in this

Second Amended Adversary Complaint, Pepsi NJ and Pepsi USA have been divisions or operating

units of or trade names used by Defendant Bottling Group.

---

[2] Terms defined herein shall have the meaning ascribed to them in the GSA.

4

11.     Defendant Quaker Sales is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 555 West Monroe Street in Chicago, Illinois.

12.     Defendant Muller Quaker is or was a joint venture between Defendant PepsiCo and The Muller Group that had a principal place of business at 5140 Ag Park Drive West, Batavia, New York.  On information and belief, Muller Quaker was dissolved in December of 2015.

13.     On information and belief, Defendant Stacy's is a corporation organized and existing under the Laws of the Commonwealth of Massachusetts with a principal place of business at 663 North Street in Randolph, Massachusetts and another place of business located at Attn: CFS, 2nd Floor, 1100 Reynolds Blvd., Winston Salem, NC 27105.

14.     Defendant Frito-Lay is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 77 Legacy Drive in Plano, Texas.

15.      On information and belief, at all times relevant to the allegations in this Second Amended Adversary Compliant, Defendant Pepsi NJ was either a division or operating unit of Defendant Bottling Group or a trade name utilized by Defendant Bottling Group.  Nevertheless, in an abundance of caution and in the event that Defendant Pepsi NJ ever was as a separate juridical entity at any time relevant to the allegations contained in this Second Amended Adversary Complaint, GAPT names Defendant Pepsi NJ as a defendant in this adversary proceeding. Defendant Pepsi NJ has a principal place of business located at 700 Anderson Hill Road in Purchase, New York and operates places of business at 15 Melanie Lane in East Hanover, New Jersey and 690 Belleville Turnpike, Kearney, New Jersey 07032.

5

16.     On information and belief, Defendant Pepsi USA was either a division or operating unit of Defendant Bottling Group or a tradename utilized by Defendant Bottling Group. Nevertheless, in an abundance of caution and in the event that Defendant Pepsi USA ever was as a separate juridical entity at any time relevant to the allegations contained in this Second Amended Adversary Complaint, GAPT names Defendant Pepsi USA as a defendant in this adversary proceeding.   Pepsi USA has a principal place of business at 700 Anderson Hill Road in Purchase, New York and operates a place of business at 690 Belleville Turnpike, Kearney, New Jersey 07032.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

18.     As to the First through Fourth Causes of Action and the Twenty-Sixth Cause of Action set forth below, this adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

19.     As to the Fifth through Twenty-Sixth Causes of Action set forth below, this adversary proceeding is a core proceeding at least as to claims arising from post-petition Promotions.

20.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

21.     As to the First through Fourth Causes of Action set forth below, the statutory predicates for the relief requested herein are sections 547 and 550 of the United States Bankruptcy Code (11 U.S.C. § 101, *et seq*.) ("Bankruptcy Code").

2613717.1   032596-97802

22.    As to the Fifth through Twenty-Sixth Causes of Action set forth below, GAPT requests relief under the applicable common law (or laws) of express and implied contract, unjust enrichment and promissory estoppel, including, but not limited to, the laws of the State of New York.

23.    This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), sections 547 and 550 of the Bankruptcy Code, and the common law of express and implied contract, unjust enrichment and promissory estoppel.

### FACTS

**A.    Case Background.**

24.    On July 19, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Following June 19, 2015, the Debtors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

25.    The Debtors' Chapter 11 Cases are jointly administered under Case No. 15-23007 (RDD).

**B.    Facts Generally Relevant to the Preference Counts of this Second Amended Adversary Complaint**

26.    GAPT is one of the nation's oldest retailers.  GAPT's primary retail operations consisted of supermarkets operating under a variety of trade names, or "banners" including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars and A&P Liquors.

7

27.     During the ninety days immediately preceding the Petition Date ("Preference Period"), GAPT  made payments to the Preference Defendants for goods and/or services previously provided to the Debtors pursuant to invoices or statements submitted by the Preference Defendants to GAPT (collectively, "Transfers").

28.     The Transfers were made to or for the benefit of the Preference Defendants in at least the amounts set forth below:

| Entity | Preference Payments |
|---|---|
| Frito Lay | $13,376,141 |
| Bottling Group | $4,930,368 |
|  |  |
| **TOTAL:** | **$18,306,509** |

29.     The aggregate amount of the Transfers is not less than $18,306,509, subject to any defenses, offsets or credits to which the Preference Defendants show themselves entitled.

30.     The Debtors making the Transfers were insolvent at the time each of the Transfers was made.

31.     As of the Petition Date, a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code would not have generated sufficient proceeds to satisfy the secured claims against the Debtors.  Consequently, receipt of the Transfers allowed the Preference Defendants to receive a distribution greater than they would have received pursuant to the priorities set forth for a Chapter 7 liquidation of the Debtors' bankruptcy estates if the Transfers had not been made.

32.     During the Preference Period, commencing on or about May 4, 2015, the Preference Defendants took aggressive collection actions with respect to the Debtors, particularly by tightening credit terms.  Between May 4, 2015 and the Petition Date, each of the Preference Defendants tightened the Debtors' credit terms on at least two occasions.

8

33.     Initially, the Preference Defendants reduced the Debtors' credit terms from 26 days to between 12 and 15 days.  Between May 15, 2015 and June 25, 2015, the Preference Defendants advised Debtors of their intent to further reduce credit terms.   By June 25, 2015, all of the Preference Defendants had reduced the Debtors' credit terms to 5 days.

34.     The tightening of the Debtors' credit terms had its intended effect.  Between May 4, 2015 and the Petition Date, the average time between the date of invoice and payment decreased significantly.  With the exception of a few outlier invoices and one case in which credit terms reverted to 26 days, the decrease was universally progressive.

35.     The Debtors may have made certain payments during the Preference Period to clear up older invoices.  The payments that cleared up older invoices were made in response either to actual pressure by the Preference Defendants or pressure to pay felt by the Debtors based on the tightening of credit terms.

36.     Indeed, the Preference Defendants were more aggressive in their collection activities during the Preference Period than many of the Debtors' remaining creditors.

37.     By letters dated December 14, 2016, the Committee sent advance demand letters which were received by each of the Preference Defendants inviting an exchange of information regarding any potential defenses.  The parties were unable to reach any resolution of the validity of the expenses.

**C.     Facts Generally Relevant to the Debtors' Accounts Receivable or Promotional Claims against the Promotion Defendants.**

38.     At various times GAPT entered into agreements (collectively, "Promotional Agreements") with one or more of the  Promotion  Defendants pursuant to which the Promotion

9

2613717.1   032596-97802

Defendant counter-party or counter-parties would run promotions (collectively, "Promotions") at GAPT's stores.

39.    On information and belief, any Promotional Agreements between GAPT and any of the Promotion Defendants that had been signed by GAPT had expired by the end of 2010.

40.    Even after the expiration of the written Promotional Agreements referenced above, the Promotion Defendants continued to run Promotions at GAPT's stores between December 24, 2010 and the date the last of the GAPT stores were closed in 2015.

41.    In particular, Defendant Frito-Lay, which had developed new products, continued to actively run Promotions at the GAPT stores until the final stores were closed.  Indeed, GAPT's post-petition claims against Defendant Frito-Lay that arise out of Promotions approximate $3.1 million and constitute the largest portion of GAPT's claims arising out of post-petition Promotions.

42.    During the years from 2011 through 2016, the Promotion Defendants  made payments aggregating approximately $211,597,000 to GAPT for participating in Promotions as follows:

      i.    2011:  $46,170,000

      ii.    2012:  $50,494,000

      iii.    2013: $44,764,000

      iv.    2014: $44,384,000

      v.    2015: $25,732,000

      vi.    2016: $53,000

43.    From and after December 24, 2010, Promotion Transactions (defined in ¶ 84 below) between GAPT and the Promotion Defendants were evidenced and memorialized by Deal Sheets, Deal Histories, Invoices and Account Reports (collectively, "Transaction Documents").

2613717.1  032596-97802

44.     At all times following December 24, 2010, Promotions were initiated by the applicable Promotion Defendant. The initiating Promotion Defendant made an offer electronically to GAPT through a third party, Demandtec, to run a Promotion.  GAPT would decide whether to accept the offer.  If GAPT accepted the offer, it would do so electronically and Demandtec would record the time and date of offer and acceptance on the applicable Deal Sheet.  The offer and acceptance were authenticated via electronic signatures on the applicable Deal Sheets.

45.     The Transaction Documents set forth the basis for calculating the amount GAPT would be paid for participating in the Promotion.  Within a week or month after the completion of a Promotion, GAPT would invoice the applicable Promotion Defendant for the Promotion.

46.     The Promotions contemplated and required GAPT personnel to take certain actions, including: (i) store set-up; (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with the applicable Promotion Defendant to deliver sufficient product to fill shelves and endcaps.

47.     The Promotions also contemplated and required GAPT to incur certain out-of-pocket expenses, including:  (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) the loss of margin resulting from discounting prices in connection with a Promotion.

48.     The Promotions also contemplated and required GAPT to bear the initial expense of providing the customer with the benefit of a Promotion.    If a reduction in price was required, GAPT would reduce the price charged.  The Transaction Documents provided for the applicable Promotion Defendant to reimburse GAPT for the price reduction.

49.     At no time before December, 2015, did any of the Promotion Defendants advise GAPT that they would not pay for Promotions.

2613717.1   032596-97802

50.    At no time before January, 2016 did any of the Promotion Defendants advise GAPT that they did not consider themselves obligated to pay for any completed Promotions.

51.    The Promotion Defendants continued to pay for Promotions they ran at GAPT's stores as late as January 28, 2016.  In many cases Promotions were paid for by offsetting GAPT's claims arising out of Promotion against their payables to the applicable Promotion Defendant.  By way of example, Defendant Frito-Lay made its last "payment" for a Promotion through such an offset, in the amount of $115,235.00 on November 19, 2015.

52.    Between them, the Promotion Defendants currently owe GAPT the aggregate sum of $7,263,739.96 for Promotions conducted at GAPT's stores, most of which were conducted in 2014 and 2015.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Avoidance of Preferential Transfers—11 U.S.C. § 547—As to Defendant Frito-Lay)

53.    The allegations of Paragraphs 1 through 52 are incorporated herein by reference with the same force and effect as if set forth in full below.

54.    During the Preference Period, GAPT made Transfers to Defendant Frito-Lay in an amount not less than $13,376,141.

55.    Each of the Transfers to Defendant Frito-Lay constituted a transfer of property of GAPT.

56.    Each of the Transfers to Defendant Frito-Lay was made to or for the benefit of Defendant Frito-Lay.

12

2613717.1   032596-97802

57.     Defendant Frito-Lay was a creditor of GAPT within the meaning of 11 U.S.C. § 110(10) at the time of each of the Transfers made to Defendant Frito-Lay were made or, alternatively, received the Transfers to it for the benefit of a creditor or creditors of GAPT.

58.     Each of the Transfers to Defendant Frito-Lay was made on account of an antecedent debt owed by GAPT to Defendant Frito-Lay before the Transfer was made.

59.     Each of the Transfers to Defendant Frito-Lay was made while the GAPT Debtor making the Transfer was insolvent.  Pursuant to 11 U.S.C. § 547(f), all of the GAPT Debtors are deemed to have been insolvent throughout the Preference Period.

60.     Each of the Transfers to Defendant Frito-Lay enabled Defendant Frito-Lay to receive more than Defendant Frito-Lay would have received if (i) the Transfers to Defendant Frito-Lay had not been made, and (ii) Defendant Frito-Lay received payment on account of the debt paid by each of the Transfers to the extent provided by the Bankruptcy Code.

61.     The Transfers to Defendant Frito-Lay were made in response to aggressive collection methods taken by Defendant Frito-Lay.

62.     As of the date hereof, Defendant Frito-Lay has not returned to GAPT any of the Transfers it received from GAPT during the Preference Period.

63.     The Debtors are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Transfers made to Defendant Frito-Lay during the Preference Period.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Recovery of Property—11 U.S.C. § 550—As to Defendant Frito-Lay)

64.     The allegations of Paragraphs 1 through 63 are incorporated herein by reference with the same force and effect as if set forth in full below

2613717.1   032596-97802

65.     Pursuant to 11 U.S.C. § 550(a), the extent that a Transfer is avoided under 11 U.S.C. § 547, the Debtors may recover for the benefit of their bankruptcy estates, the property transferred or the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee.

66.     Defendant Frito-Lay is either (a) the initial transferee of the Transfers made to it during the Preference Period, (b) the entity for whose benefit said Transfers were made, or (c) an immediate or mediate transferee of the original transferee.

67.     Subject to Defendant Frito-Lay's potential defenses, the Debtors are entitled to recover on behalf of their bankruptcy estates the value of the Transfers made to Defendant Frito-Lay during the Preference Period pursuant to 11 U.S.C. § 550(a).

## AS AND FOR A THIRD CAUSE OF ACTION

**(Avoidance of Preferential Transfers—11 U.S.C. § 547—
As to Defendant Bottling Group)**

68.     The allegations of Paragraphs 1 through 67 are incorporated herein by reference with the same force and effect as if set forth in full below.

69.     During the Preference Period, GAPT made Transfers to Bottling Group in an amount not less than $4,930,368.00.

70.     Each of the Transfers to Defendant Bottling Group constituted a transfer of property of GAPT.

71.     Each of the Transfers to Defendant Bottling Group was made to or for the benefit of Defendant Bottling Group.

14

2613717.1  032596-97802

72.     Defendant Bottling Group was a creditor of GAPT within the meaning of 11 U.S.C. § 110(10) at the time of each of the Transfers made to Defendant Bottling Group were made or, alternatively, received the Transfers to it for the benefit of a creditor or creditors of GAPT.

73.     Each of the Transfers to Defendant Bottling Group was made on account of an antecedent debt owed by GAPT to Defendant Bottling Group before the Transfer was made.

74.     Each of the Transfers to Defendant Bottling Group was made while the GAPT Debtor making the Transfer was insolvent.  Pursuant to 11 U.S.C. § 547(f), all of the GAPT Debtors are deemed to have been insolvent throughout the Preference Period.

75.     Each of the Transfers to Defendant Bottling Group enabled Defendant Bottling Group, to receive more than they would have received if (i) the Transfers to Defendant Bottling Group had not been made, and (ii) Defendant Bottling Group received payment on account of the debt paid by each of the Transfers to the extent provided by the Bankruptcy Code.

76.     The Transfers to Defendant Bottling Group were made in response to aggressive collection methods take by Defendant Bottling Group.

77.     As of the date hereof, neither Defendant Bottling Group nor any other person or entity has returned to GAPT any of the Transfers made to Defendant Bottling Group during the Preference Period.

78.     The Debtors are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Transfers made to Defendant Bottling Group during the Preference Period.

2613717.1   032596-97802

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Recovery of Property—11 U.S.C. § 550— As to Defendant Bottling Group)

79.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

80.    Pursuant to 11 U.S.C. § 550(a), the extent that a Transfer is avoided under 11 U.S.C. § 547, the Debtors may recover for the benefit of their bankruptcy estates, the property transferred or the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee.

81.    Defendant Bottling Group is either (a) the initial transferee of the Transfers made to Defendant Bottling Group during the Preference Period, (b) the entity for whose benefit said Transfers were made, or (c) an immediate or mediate transferee of the original transferee.

82.    Subject to the potential defenses to which Defendant Bottling Group is entitled, the Debtors are entitled to recover the value of the Transfers made to Defendant Bottling Group during the Preference Period pursuant to 11 U.S.C. § 550(a).

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendant Frito-Lay)

83.    The allegations of Paragraphs 1 through 82 are incorporated herein by reference with the same force and effect as if set forth in full below.

84.    Between December 24, 2010 and November 25, 2015, Defendant Frito-Lay initiated numerous Promotions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.    GAPT accepted the offers resulting in Promotion-related

16

transactions (hereafter, "Promotion Transactions"). The agreement of GAPT and Defendant Frito-Lay to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized in the Transaction Documents applicable to Promotions conducted by Defendant Frito-Lay at GAPT's stores.

85.    In connection with each Promotion conducted by Defendant Frito-Lay at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Frito-Lay to deliver sufficient product to fill shelves and endcaps.

86.    In connection with each Promotion conducted by Defendant Frito-Lay at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

87.    In connection with each Promotion Transaction between GAPT and Defendant Frito-Lay, Defendant Frito-Lay agreed to pay GAPT certain consideration as set forth in the Transaction Documents.    Among other things, Defendant Frito-Lay agreed to reimburse GAPT any price reductions by GAPT in connection with a Promotion.

88.    Between December 24, 2010 and November 19, 2015, Defendant Frito-Lay paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

17

89.      In many instances, Defendant Frito-Lay paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Frito-Lay.  The last such offset occurred on November 19, 2015.

90.      Defendant Frito-Lay has not, however, paid GAPT for all Promotions conducted by Defendant Frito-Lay at GAPT's stores

91.      As of the date of this Second Amended Adversary Complaint, there is due and owing from Defendant Frito-Lay the sum of $3,119,439.21, less any credits or offsets to which Defendant Frito-Lay shows itself entitled, in connection with Promotions conducted by Defendant Frito-Lay at GAPT's stores.

92.      GAPT is entitled to recover the sum of $3,119,439.21, less any credits to which Defendant Frito-Lay shows itself to be entitled, from Defendant Frito-Lay in connection with those Promotions.

## ALTERNATIVELY, AS AND FOR A SIXTH CAUSE OF ACTION

### (Unjust Enrichment—Defendant Frito-Lay)

93.      The allegations of Paragraphs 1 through 92 are incorporated herein by reference with the same force and effect as if set forth in full below.

94.      Between December 24, 2010 and November 25, 2015, Defendant Frito-Lay conducted numerous Promotions at GAPT's stores.

95.      GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Frito-Lay at GAPT's stores.

96.      Defendant Frito-Lay benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

18

97.    Defendant Frito-Lay is indebted to GAPT in the amount of $3,119,439.21, less any credits to which Defendant Frito-Lay shows itself to be entitled, in connection with Promotions Defendant Frito-Lay conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A SEVENTH CAUSE OF ACTION

### (Promissory Estoppel—Defendant Frito Lay)

98.    The allegations of Paragraphs 1 through 97 are incorporated herein by reference with the same force and effect as if set forth in full below.

99.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Frito-Lay expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

100.    Relying on Defendant Frito-Lay's promise to pay, in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

101.    GAPT's reliance on Defendant Frito-Lay's promises to pay for Promotions was reasonable, particularly in light of Defendant Frito-Lay's history of paying for Promotions it conducted at GAPT's stores.

102.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Frito-Lay at GAPT's stores in reliance on Defendant Frito-Lay's promise to pay for the Promotions and is, entitled to recover $3,119,439.21, less any credits to which Defendant Frito-Lay shows itself entitled, from Defendant Frito-Lay.

2613717.1    032596-97802

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendant Bottling Group)

103.    The allegations of Paragraphs 1 through 102 are incorporated herein by reference with the same force and effect as if set forth in full below.

104.    Between December 24, 2010 and November 25, 2015, Defendant Bottling Group, acting in its own name and through divisions, operating units or trade names including, but not limited to, Pepsi NJ and Pepsi USA, initiated Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.  GAPT accepted the offers resulting in Promotion Transactions.  The agreement of GAPT and Defendant Bottling Group to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized by the Transaction Documents applicable to Promotions conducted by Defendant Bottling Group at GAPT's stores.

105.    In connection with each Promotion conducted by Defendant Bottling  Group  at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Bottling Group to deliver sufficient product to fill shelves and endcaps.

106.    In connection with each Promotion conducted by Defendant Bottling Group at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

2613717.1   032596-97802

107.    In connection with each Promotion Transaction between GAPT and Defendant Bottling Group, Defendant Bottling Group agreed to pay GAPT certain consideration as set forth in the Transaction Documents.    Among other things, Defendant Bottling Group agreed to reimburse GAPT for any price reductions by GAPT in connection with a Promotion.

108.    Between December 24, 2010 and November 25, 2015, Defendant Bottling Group paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

109.    In many instances, Defendant Bottling Group paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Bottling Group.

110.    Defendant Bottling Group has not, however, paid GAPT for all Promotions conducted by Defendant Bottling Group at GAPT's stores.

111.    As of the date of this Second Amended Adversary Complaint, there is due and owing from Defendant Bottling Group the sum of $1,050,657.00 (which sum includes $577,844.00 paid on Pepsi NJ invoices and $455,142.00 paid on Pepsi USA invoices), less any credits to which Defendant Bottling Group shows itself entitled, in connection with Promotions conducted by Defendant Bottling Group at GAPT's stores.

112.    GAPT is entitled to recover the sum of $1,050,657.00, less any credits to which Defendant Bottling Group shows itself to be entitled, from Defendant Bottling Group in connection with those Promotions.

2613717.1   032596-97802

## ALTERNATIVELY, AS AND FOR A NINTH CAUSE OF ACTION

### (Unjust Enrichment—Defendant Bottling Group)

113.     The allegations of Paragraphs 1 through 112 are incorporated herein by reference with the same force and effect as if set forth in full below.

114.     Between December 24, 2010 and November 25, 2015, Defendant Bottling Group, in its own name and through divisions, operating units and trade names, including, but not limited to, Pepsi NJ and Pepsi USA, conducted numerous Promotions at GAPT's stores.

115.     GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Bottling Group at GAPT's stores.

116.     Defendant Bottling Group benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

117.     Defendant Bottling Group is indebted to GAPT in the amount of $1,050,657.00, less any credits to which Defendant Bottling Group shows itself entitled, in connection with Promotions Defendant Bottling Group conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A TENTH CAUSE OF ACTION

### (Promissory Estoppel—Defendant Bottling Group)

118.     The allegations of Paragraphs 1 through 117 are incorporated herein by reference with the same force and effect as if set forth in full below.

119.     In connection with each of the Promotions it conducted at GAPT's stores, Defendant Bottling Group expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

2613717.1   032596-97802

120.     Relying on Defendant Bottling Group's promise to pay in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

121.     GAPT's reliance on Defendant Bottling Group's promises to pay for Promotions was reasonable, particularly in light of Defendant Bottling Group's history of paying for Promotions it conducted at GAPT's stores.

122.     GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Bottling Group at GAPT's stores and in reliance on Defendant Bottling Group's promise to pay for Promotions and is, therefore, entitled to recover $1,050,657.00 less any credits to which Defendant Bottling Group shows itself entitled, from Defendant Bottling Group.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendant Pepsi NJ)

123.     The allegations of Paragraphs 1 through 122 are incorporated herein by reference with the same force and effect as if set forth in full below.

124.     Between December 24, 2010 and November 25, 2015, Defendant Pepsi NJ, either in its own capacity or through Defendant Bottling Group initiated Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.  GAPT accepted the offers resulting in Promotion Transactions.  The agreement of GAPT and Defendant Pepsi NJ to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized by the Transaction Documents applicable to Promotions conducted by Defendant Pepsi NJ at GAPT's stores.

2613717.1   032596-97802

125.    In connection with each Promotion conducted by Defendant Pepsi NJ at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Pepsi NJ to deliver sufficient product to fill shelves and endcaps.

126.    In connection with each Promotion conducted by Defendant Pepsi NJ at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

127.    In connection with each Promotion Transaction between GAPT and Defendant Pepsi NJ, Defendant Pepsi NJ agreed to pay GAPT certain consideration as set forth in the Transaction Documents.   Among other things, Defendant Pepsi NJ agreed to reimburse GAPT for any price reductions by GAPT in connection with a Promotion.

128.    Between December 24, 2010 and November 25, 2015, Defendant Pepsi NJ paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

129.    In many instances, Defendant Pepsi NJ paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Pepsi NJ.

130.    Defendant Pepsi NJ has not, however, paid GAPT for all Promotions conducted by Defendant Pepsi NJ at GAPT's stores.

2613717.1   032596-97802

131.    As of the date of this Second Amended Adversary Complaint, to the extent that Defendant Pepsi NJ constitutes a separate juridical entity from Defendant Bottling Group, there is due and owing from Defendant Pepsi NJ the sum of $577,844.00, less any credits to which Defendant Pepsi NJ shows itself entitled, in connection with Promotions conducted by Defendant Pepsi NJ at GAPT's stores.

132.    To the extent that Pepsi NJ is a separate judicial entity from Defendant Bottling Group, GAPT is entitled to recover the sum of $577,844.00, less any credits to which Defendant Pepsi NJ shows itself to be entitled, from Defendant Pepsi NJ in connection with those Promotions.

## ALTERNATIVELY, AS AND FOR A TWELFTH CAUSE OF ACTION

### (Unjust Enrichment—Defendant Pepsi NJ)

133.    The allegations of Paragraphs 1 through 132 are incorporated herein by reference with the same force and effect as if set forth in full below.

134.    Between December 24, 2010 and November 25, 2015, Defendant Pepsi NJ conducted numerous Promotions at GAPT's stores.

135.    GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Pepsi NJ at GAPT's stores.

136.    Defendant Pepsi NJ benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

137.    To the extent that it is a separate judicial entity from Defendant Bottling Group, Defendant Pepsi NJ is indebted to GAPT in the amount of $577,844.00, less any credits to which Defendant Pepsi NJ shows itself entitled, in connection with Promotions Defendant Pepsi NJ

2613717.1   032596-97802

conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A  THIRTEENTH CAUSE OF ACTION

### (Promissory Estoppel—Defendant Pepsi NJ)

138.    The allegations of Paragraphs 1 through 137 are incorporated herein by reference with the same force and effect as if set forth in full below.

139.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Pepsi NJ expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

140.    Relying on Defendant Pepsi NJ's promise to pay in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

141.    GAPT's reliance on Defendant Pepsi NJ's promises to pay for Promotions was reasonable, particularly in light of Defendant Pepsi NJ's history of paying for Promotions it conducted at GAPT's stores.

142.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Pepsi NJ at GAPT's stores and in reliance on Defendant Pepsi NJ's promise to pay for Promotions and is, therefore, to the extent that Pepsi NJ is a separate judicial entity from Defendant Bottling Group, entitled to recover $574,844.00 less any credits to which Defendant Bottling Group shows itself entitled, from Defendant Pepsi NJ.

2613717.1   032596-97802

## AS AND FOR A FOURTEENTH CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendant Pepsi USA)

143.    The allegations of Paragraphs 1 through 142 are incorporated herein by reference with the same force and effect as if set forth in full below.

144.    Between December 24, 2010 and November 25, 2015, Defendant Pepsi USA, either in its own capacity or through Defendant Bottling Group, initiated Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.  GAPT accepted the offers resulting in Promotion Transactions.  The agreement of GAPT and Defendant Pepsi USA to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized by the Transaction Documents applicable to Promotions conducted by Defendant Pepsi USA at GAPT's stores.

145.    In connection with each Promotion conducted by Defendant Pepsi USA at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Pepsi USA to deliver sufficient product to fill shelves and endcaps.

146.    In connection with each Promotion conducted by Defendant Pepsi USA at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

147.    In connection with each Promotion Transaction between GAPT and Defendant Pepsi USA, Defendant Pepsi USA agreed to pay GAPT certain consideration as set forth in the

27

Transaction Documents.   Among other things, Defendant Pepsi USA agreed to reimburse GAPT for any price reductions by GAPT in connection with a Promotion.

148.    Between December 24, 2010 and November 25, 2015, Defendant Pepsi USA paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

149.    In many instances, Defendant Pepsi USA paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Pepsi USA.

150.    Defendant Pepsi USA has not, however, paid GAPT for all Promotions conducted by Defendant Pepsi USA at GAPT's stores.

151.    As of the date of this Second Amended Adversary Complaint, to the extent that Defendant Pepsi USA constitutes a separate juridical entity from Defendant Bottling Group, there is due and owing from Defendant Pepsi USA the sum of $455,142.00, less any credits to which Defendant Pepsi USA shows itself entitled, in connection with Promotions conducted by Defendant Pepsi USA at GAPT's stores.

152.    To the extent that Pepsi USA is a separate entity from Defendant Bottling Group, GAPT is entitled to recover the sum of $455,142.00, less any credits to which Defendant USA shows itself to be entitled, from Defendant Pepsi USA in connection with those Promotions.

## ALTERNATIVELY, AS AND FOR A FIFTEENTH CAUSE OF ACTION

### (Unjust Enrichment—Defendant Pepsi USA)

153.    The allegations of Paragraphs 1 through 152 are incorporated herein by reference with the same force and effect as if set forth in full below.

2613717.1   032596-97802

154.    Between December 24, 2010 and November 25, 2015, Defendant Pepsi USA conducted numerous Promotions at GAPT's stores.

155.    GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Pepsi USA at GAPT's stores.

156.    Defendant Pepsi USA benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

157.    To the extent that it is a separate entity from Defendant Bottling Group, Defendant Pepsi USA is indebted to GAPT in the amount of $455,142.00, less any credits to which Defendant Pepsi USA shows itself entitled, in connection with Promotions Defendant Pepsi USA conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A SIXTEENTH CAUSE OF ACTION

### (Promissory Estoppel—Defendant Pepsi USA)

158.    The allegations of Paragraphs 1 through 157 are incorporated herein by reference with the same force and effect as if set forth in full below.

159.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Pepsi USA expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

160.    Relying on Defendant Pepsi USA's promise to pay in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

2613717.1  032596-97802

161.    GAPT's reliance on Defendant Pepsi USA's promises to pay for Promotions was reasonable, particularly in light of Defendant Pepsi USA's history of paying for Promotions it conducted at GAPT's stores.

162.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Pepsi USA at GAPT's stores and in reliance on Defendant Pepsi USA's promise to pay for Promotions and is, to the extent that Defendant Pepsi USA is a separate juridical entity from Defendant Bottling Group, therefore, entitled to recover $455,142.00 less any credits to which Defendant Pepsi USA shows itself entitled, from Defendant Pepsi USA.

<u>AS AND FOR A SEVENTEENTH CAUSE OF ACTION</u>

**(Breach of Express and Implied Contract—Defendant Quaker Sales)**

163.    The allegations of Paragraphs 1 through 162 are incorporated herein by reference with the same force and effect as if set forth in full below.

164.    Between December 24, 2010 and November 25, 2015, Defendant Quaker Sales initiated numerous Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.  GAPT accepted the offers resulting in Promotion Transactions.  The agreement of GAPT and Defendant Quaker Sales to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized in the Transaction Documents applicable to the Promotions conducted by Defendant Quaker Sales at GAPT's stores.

165.    In connection with each Promotion conducted by Defendants Quaker Sales at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii)

30

arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Quaker Sales to deliver sufficient product to fill shelves and endcaps.

166.    In connection with each Promotion conducted by Defendant Quaker Sales at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

167.    In connection with each Promotion Transaction between GAPT and Defendant Quaker Sales, Defendant Quaker Sales agreed to pay GAPT certain consideration as set forth in the Transaction Documents.    Among other things, Defendant Quaker Sales agreed to reimburse GAPT for any price reductions by GAPT in connection with a Promotion.

168.    Between December 24, 2010 and January 28, 2016, Defendant Quaker Sales paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

169.    In many instances, Defendant Quaker Sales paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Quaker Sales.

170.    Defendant Quaker Sales has not, however, fully paid GAPT the amounts due for all Promotions conducted by Defendant Quaker Sales at GAPT's stores.

171.    As of the date of this Second Amended Adversary Complaint, there is due and owing from Defendant Quaker Sales the sum of $3,029,238.23, less any credits to which

31

Defendant Quaker Sales shows itself entitled, in connection with Promotions conducted by Defendant Quaker Sales at GAPT's stores.

172.    GAPT is entitled to recover the sum of $3,029,238.23, less any credits to which Defendant  Quaker Sales shows itself entitled, from Defendant Quaker Sales in connection with those Promotions.

## ALTERNATIVELY, AS AND FOR AN EIGHTEENTH CAUSE OF ACTION

### (Unjust Enrichment—Defendant Quaker Sales)

173.    The allegations of Paragraphs 1 through 172 are incorporated herein by reference with the same force and effect as if set forth in full below.

174.    Between December 24, 2010 and November 25, 2015, Defendant Quaker Sales conducted numerous Promotions at GAPT's stores.

175.    GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Quaker Sales at GAPT's stores.

176.    Defendant Quaker Sales benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

177.    Defendant Quaker Sales is indebted to GAPT in the amount of $3,029,238.23, less any credits to which Defendant Quaker Sales shows itself entitled, in connection with Promotions Defendant Quaker Sales conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

2613717.1   032596-97802

## ALTERNATIVELY, AS AND FOR A NINETEENTH CAUSE OF ACTION

### (Promissory Estoppel—Defendant Quaker Sales)

178.    The allegations of Paragraphs 1 through 177 are incorporated herein by reference with the same force and effect as if set forth in full below.

179.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Quaker Sales expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

180.    Relying on the promises by Defendant Quaker Sales to pay in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

181.    GAPT's reliance on the promises by Defendant Quaker Sales' promises to pay for Promotions was reasonable, particularly in light of the history of Defendant Quaker Sales paying for Promotions they conducted at GAPT's stores.

182.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Quaker Sales at GAPT's stores and in reliance on the promises of Defendant Quaker Sales to pay for Promotions and is, therefore, entitled to recover $3,029,238.23, less any credits to which Defendant Quaker Sales shows itself entitled from Defendant Quaker Sales.

## AS AND FOR A TWENTIETH CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendant Stacy's)

183.    The allegations of Paragraphs 1 through 182 are incorporated herein by reference with the same force and effect as if set forth in full below.

2613717.1   032596-97802

184.     Between December 24, 2010 and November 25, 2015, Defendant Stacy's initiated numerous Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.  GAPT accepted the offers resulting in Promotion Transactions.  The agreement of GAPT and Defendant Stacy's to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized in the Transaction Documents applicable to Promotions conducted by Defendant Stacy's at GAPT's stores.

185.     In connection with each Promotion conducted by Defendant Stacy's at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Stacy's to deliver sufficient product to fill shelves and endcaps.

186.     In connection with each Promotion conducted by Defendant Stacy's at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

187.     In connection with each Promotion Transaction between GAPT and Defendant Stacy's, Defendant Stacy's agreed to pay GAPT certain consideration as set forth in the Transaction Documents.   Among other things, Defendant Stacy's agreed to reimburse GAPT any price reductions by GAPT in connection with a Promotion.

188.     Between December 24, 2010 and January 28, 2016, Defendant Stacy's paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

34

189.    In many instances, Defendant Stacy's paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Stacy's.

190.    Defendant Stacy's has not, however, paid GAPT for all Promotions conducted by Defendant Stacy's at GAPT's stores.

191.    As of the date of this Second Amended Adversary Complaint, there is due and owing from Defendant Stacy's the sum of $20,847.48, less any credits or offsets to which Defendant Stacey's shows itself entitled, in connection with Promotions conducted by Defendant Stacy's at GAPT's stores.

192.    GAPT is entitled to recover the sum of $20,847.48, less any credits to which Defendant Stacy's shows itself entitled, from Defendant Stacy's in connection with those Promotions.

## ALTERNATIVELY, AS AND FOR A TWENTY-FIRST CAUSE OF ACTION

### (Unjust Enrichment—Defendant Stacy's)

193.    The allegations of Paragraphs 1 through 192 are incorporated herein by reference with the same force and effect as if set forth in full below.

194.    Between December 24, 2010 and November 25, 2015, Defendant Stacy's conducted numerous Promotions at GAPT's stores.

195.    GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Stacy's at GAPT's stores.

196.    Defendant Stacy's benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

35

2613717.1   032596-97802

197.    Defendant Stacy's is indebted to GAPT in the amount of $20,847.48, less any credits to which Defendant Stacy's shows itself entitled, in connection with Promotions Defendant Stacy's conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### (Promissory Estoppel—Defendant Stacy's)

198.    The allegations of Paragraphs 1 through 197 are incorporated herein by reference with the same force and effect as if set forth in full below.

199.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Stacy's expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

200.    Relying on the promise of Defendant Stacy's to pay, in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

201.    GAPT's reliance on the promise of Defendant Stacy's to pay for Promotions was reasonable, particularly in light of the history of Defendant Stacy's paying for Promotions it conducted at GAPT's stores.

202.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Stacy's at GAPT's stores in reliance on Defendant Stacy's promise to pay for the Promotions and is, entitled to recover $20,847.48, less any credits to which Defendant Stacy's shows itself entitled, from Defendant Stacy's.

2613717.1   032596-97802

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION

### (Breach of Express and Implied Contract—Defendants Muller Quaker and PepsiCo)

203.    The allegations of Paragraphs 1 through 202 are incorporated herein by reference with the same force and effect as if set forth in full below.

204.    Between December 24, 2010 and November 25, 2015, Defendant Muller Quaker initiated numerous Promotion Transactions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet.    GAPT accepted the offers resulting in Promotion Transactions.    The agreement of GAPT and Defendant Muller Quaker to enter into Promotion Transactions was authenticated via electronic signatures on the applicable Deal Sheet and is memorialized in the Transaction Documents applicable to Promotions conducted by Defendant Muller Quaker at GAPT's stores.

205.    In connection with each Promotion conducted by Defendant Muller Quaker at GAPT's stores, GAPT actually provided numerous services, including (i) store set-up, (ii) arranging for advertising; (iii) ensuring that sufficient product was stocked at each store participating in the Promotion; and (iv) arranging with Defendant Muller Quaker to deliver sufficient product to fill shelves and endcaps.

206.    In connection with each Promotion conducted by Defendant Muller Quaker at GAPT's stores, GAPT incurred out-of-pocket expenses, such as: (i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) loss of margin resulting from discounting prices in connection with a Promotion.

207.    In connection with each Promotion Transaction between GAPT and Defendant Muller Quaker agreed to pay GAPT certain consideration as set forth in the Transaction

37

2613717.1   032596-97802

Documents.   Among other things, Defendant Muller Quaker agreed to reimburse GAPT any price reductions by GAPT in connection with a Promotion.

208.    Between December 24, 2010 and January 28, 2016, Defendant Muller Quaker paid GAPT for certain Promotions run at GAPT's stores, including reimbursing GAPT for price reductions in connection with Promotions.

209.    In many instances, Defendant Muller Quaker paid GAPT for those Promotions by offsetting GAPT's claim arising out of the Promotion against the amounts due by GAPT to Defendant Muller Quaker.

210.    Defendant Muller Quaker has not, however, paid GAPT for all Promotions conducted by Defendant Muller Quaker at GAPT's stores

211.    As of the date of this Second Amended Adversary Complaint, there is due and owing from Defendant Muller Quaker (and, therefore, Defendant PepsiCo, as a member of the joint venture by which Muller Quaker was formed) the sum of $34,912.04, less any credits or offsets to which Defendant Muller Quaker shows itself entitled, in connection with Promotions conducted by Defendant Muller Quaker at GAPT's stores.

212.    GAPT is entitled to recover the sum of $34,912.04, less any credits to which Defendant Muller Quaker shows itself entitled, from Defendant Muller Quaker (and, therefore, Defendant PepsiCo) in connection with those Promotions.

**ALTERNATIVELY, AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION**

**(Unjust Enrichment—Defendants Muller Quaker and PepsiCo)**

213.    The allegations of Paragraphs 1 through 212 are incorporated herein by reference with the same force and effect as if set forth in full below.

38

2613717.1   032596-97802

214.    Between December 24, 2010 and November 25, 2015, Defendant Muller Quaker conducted numerous Promotions at GAPT's stores.

215.    GAPT expended significant effort and incurred significant expense in connection with the Promotions conducted by Defendant Muller Quaker at GAPT's stores.

216.    Defendant Muller Quaker benefited from the Promotions it conducted at GAPT's stores, but has not paid GAPT for all of the Promotions it conducted at GAPT's stores.

217.    Defendant Muller Quaker (and, therefore, Defendant PepsiCo) is indebted to GAPT in the amount of $34,912.04, less any credits to which Defendant Muller Quaker shows itself entitled, in connection with Promotions Defendant Muller Quaker conducted at GAPT's stores, and equity and good conscience demand that GAPT be paid that amount for those Promotions.

## ALTERNATIVELY, AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION

### (Promissory Estoppel—Defendants Muller Quaker and PepsiCo)

218.    The allegations of Paragraphs 1 through 217 are incorporated herein by reference with the same force and effect as if set forth in full below.

219.    In connection with each of the Promotions it conducted at GAPT's stores, Defendant Muller Quaker expressly and unambiguously promised to pay GAPT certain consideration for participating in the Promotion.

220.    Relying on Defendant Muller Quaker's promise to pay, in connection with each such Promotion, GAPT expended significant efforts and incurred significant expenses.

221.    GAPT's reliance on Defendant Muller Quaker's promises to pay for Promotions was reasonable, particularly in light of Defendant Muller Quaker's history of paying for Promotions it conducted at GAPT's stores.

2613717.1   032596-97802

222.    GAPT has suffered significant injury in the form of the uncompensated efforts it undertook and the unreimbursed expenses it incurred in connection with Promotions conducted by Defendant Muller Quaker at GAPT's stores in reliance on Defendant Muller Quaker's promise to pay for the Promotions and is, entitled to recover $34,912.04, less any credits to which Defendant Muller Quaker shows itself entitled, from Defendants Muller Quaker and Pepsico.

## AS AND FOR A  TWENTY-SIXTH CAUSE OF ACTION

### (Breach of Contract—Against All Defendants)

223.    The allegations of Paragraphs 1 through 222 are incorporated herein by reference with the same force and effect as if set forth in full below.

224.    After the Petition Date, the Debtors and Defendant PepsiCo, on its own behalf and for the benefit of its subsidiaries, affiliates and affiliated bottlers (collectively, "Pepsi"), which, on information and belief, include all of the Defendants, entered into an Interim Credit Agreement pursuant to the Debtors provided Pepsi with post-petition deposits ("Security Deposits") to secure payment by the Debtors for post-petition purchases of Pepsi beverage products and Frito-Lay branded snack products (collectively, "Deposits").

225.    Subsequently, after they had discontinued the majority of their active operations, on or about February 16, 2016, the Debtors and Pepsi entered into a Post-Petition Deposit and Payable Resolution Agreement ("Deposit Resolution Agreement") pursuant to which the Debtors and Pepsi reconciled the amounts due for sales of beverage products and snack products and provided for the return to the Debtors of the unused portion of the Security Deposit.

2613717.1   032596-97802

226.    The Deposit Resolution Agreement authorized Pepsi to apply a total of $188,429.18 ("Deposit Return Payment") from the Security Deposit to the satisfaction of amounts due from the Debtors for post-petition sales of beverage products and snack products through February 6, 2016.

227.    The Deposit Resolution Agreement also directed Pepsi to refund $2,159,438.51 from the Security Deposit to the Debtors.  Pepsi did, in fact, refund that sum to the Debtors.

228.    The Deposit Resolution Agreement also provided for the holdback by Pepsi of the sum of $8,646.31 ("Holdback Amount") from the Security Deposit to secure the payment of any additional post-petition purchase of beverage products and branded snacks by the Debtors.

229.    Pepsi expressly acknowledged in the Deposit Resolution Agreement that, except for the Deposit Return Payment and the Holdback Amount, it was not owed any additional amounts by the Debtors for post-petition purchases of beverage products and branded snacks.

230.    There were no additional post-petition purchases of beverage products or branded snacks to which the Holdback Amount could be applied, and, for that reason the Debtors are entitled to refund by Pepsi of the Holdback amount.

231.    The Debtors have demanded that Pepsi refund the Holdback Amount, but Pepsi has failed and refused to refund the Holdback Amount.

232.    GAPT is, therefore, entitled to recover a sum in the amount of the Holdback Amount from Pepsi.

## **RESERVATION OF RIGHTS**

233.    During the course of this action, the Debtors may learn through discovery or otherwise of additional preferential Transfers made to the Preference Defendants during the

41

2613717.1    032596-97802

preference that were unknown to GAPT as of the date of this Second Amended Adversary Complaint (the "Additional Transfers")

234.    The Debtors intend to avoid and recover on behalf of GAPT all preferential transfers made to the Preference Defendants.  The Debtors reserve their right to supplement and amend the allegations contained in this Second Amended Adversary Complaint, including, but not limited to, the right to (i) allege further information regarding the Transfers, and/or (ii) allege Additional Transfers (together, the "Amendments"), that may become known to the Debtors at any time during this action through formal discovery or otherwise, and for the Amendments to relate back to this Second Amended Adversary Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, by virtue of the foregoing acts complained of, the Debtors respectfully requests that the Court enter judgment in its favor against the Defendants as follows:

(a)    On the First and Second Causes of Action, judgment against Defendant Frito-Lay determining that each Transfer made to Defendant Frito-Lay during the Preference Period is avoidable as a preferential transfer pursuant to 11 U.S.C. § 547 and that, pursuant to 11 U.S.C. § 550, GAPT is entitled to recover such Transfers in the amount of $13,376,141.00, less any offsets or credits to which Defendant Frito-Lay shows itself entitled;

(b)    On the Third and Fourth Causes of Action, judgment against Defendant Bottling Group determining that each Transfer made to Defendant Bottling Goup during the Preference Period is avoidable as a preferential transfer pursuant to 11 U.S.C. § 547 and that, pursuant to 11 U.S.C. § 550, GAPT is entitled to recover such

2613717.1   032596-97802

Transfers in the amount of $4,930,368.00, less any offsets or credits to which Defendant Bottling Group show themselves entitled;

(c)     On the Fifth  Cause of Action, judgment against Defendant Frito-Lay in the amount of $3,119,439.21, less any offsets or credits to which it shows itself entitled;

(d)     On the Sixth Cause of Action judgment against Defendant Frito-Lay in the amount of $3,119,439.21, less any offsets or credits to which it shows itself entitled;

(e)     On the Seventh Cause of Action, judgment against Defendant Frito-Lay in the amount of $3,119,439.21, less any offsets or credits to which it shows itself entitled;

(f)     On the Eighth Cause of Action, judgment against Defendant Bottling Group in the amount of $1,050,657.00, less any offsets or credits to which it shows itself entitled;

(g)     On the Ninth Cause of Action, judgment against Defendant Bottling Group in the amount of $1,050,657.00, less any offsets or credits to which it shows itself entitled;

(h)     On the Tenth Cause of Action, judgment against Defendant Bottling Group in the amount of $1,050,657.00, less any offsets or credits to which it shows itself entitled;

(i)     On the Eleventh Cause of Action, in the event Defendant Pepsi NJ is determined to be a separate entity from Defendant Bottling Group, judgment against

43

Defendant Pepsi NJ in the amount of $577,844.00, less any offsets or credits to which it shows itself entitled;

(j)      On the Twelfth Cause of Action, in the event Defendant Pepsi NJ is determined to be a separate entity from Defendant Bottling Group, judgment against Defendant Pepsi NJ in the amount of $577,844.00, less any offsets or credits to which it shows itself entitled;

(k)      On the Thirteenth Cause of Action, in the event Defendant Pepsi NJ is determined to be a separate entity from Defendant Bottling Group, judgment against Defendant Pepsi NJ in the amount of $577,844.00, less any offsets or credits to which it shows itself entitled;

(l)      On the Fourteenth Cause of Action, in the event Defendant Pepsi USA is determined to be a separate entity from Defendant Bottling Group, judgment against Defendant Pepsi USA in the amount of $455,142.00, less any offsets or credits to which it shows itself entitled;

(m)      On the Fifteenth Cause of Action, in the event Defendant Pepsi USA is determined to be a separate entity from Defendant Bottling Group, judgment against Defendant Pepsi USA in the amount of $455,142.00, less any offsets or credits to which it shows itself entitled;

(n)      On the Sixteenth Cause of Action, in the event Defendant Pepsi USA is determined to be a separate entity from Defendant Bottling Group, judgment against Defendant Pepsi NJ in the amount of $455,142.00, less any offsets or credits to which it shows itself entitled;

44

(o)  On the Seventeenth Cause of Action, judgment against Defendant Quaker Sales in the amount of $3,029,238.23, less any offsets or credits to which it shows itself entitled;

(p)  On the Eighteenth Cause of Action, judgment against Defendant Quaker Sales in the amount of $3,029,238.23, less any offsets or credits to which it shows itself entitled;

(q)  On the Nineteenth Cause of Action, judgment against Defendant Quaker Sales in the amount of $3,029,238.23, less any offsets or credits to which it shows itself entitled;

(r)  On the Twentieth Cause of Action, judgment against Defendant Stacy's in the amount of $20,847.48, less any offsets or credits to which it shows itself entitled;

(s)  On the Twenty-First Cause of Action, judgment against Defendant Stacy's in the amount of $20,847.48, less any offsets or credits to which it shows itself entitled;

(t)  On the Twenty-Second Cause of Action, judgment against Defendant Stacy's in the amount of $20,847.48, less any offsets or credits to which it shows itself entitled;

(u)  On the Twenty-Third Cause of Action, judgment against Defendants Muller Quaker and PepsiCo in the amount of $34,912.04, less any offsets or credits to which they show themselves entitled;

(v)  On the Twenty-Fourth Cause of Action, judgment against Defendant Muller Quaker and PepsiCo in the amount of $34,912.04, less any offsets or credits to which they show themselves entitled;

2613717.1   032596-97802

(w)     On the Twenty-Fifth Cause of Action, judgment against Defendant Muller Quaker and PepsiCo in the amount of $34,912.04, less any offsets or credits to which they show themselves entitled;

(x)     On the Twenty-Sixth Cause of Action, judgment against all Defendants, jointly and severally, in the amount of $8,646.00;

(y)     Costs of suit, including, but not limited to, reasonable attorneys' fees,

(z)     Pre- and post-judgment interest on all Causes of Action to the fullest extent allowed by law; and

(aa)    Such other and further relief as this court deems just and equitable.

Dated: Newark, New Jersey
       August 17, 2018

**GIBBONS P.C.**


By: _/s/ David N. Crapo_
        Philip J. Duffy
        David N. Crapo

    One Gateway Center
    Newark, New Jersey 07102-5310
    *Attorneys for Plaintiffs*
    *The Great Atlantic & Pacific Tea Company, Inc.,*
    *et al.*

46