Jeffrey Chubak
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
jchubak@storchamini.com
- and -
Joseph D. Frank (admitted *pro hac vice*)
Jeremy C. Kleinman (admitted *pro hac vice*)
FRANKGECKER LLP
1327 W. Washington Blvd., Suite 5G-H
Chicago, Illinois 60607
(312) 276-1400
jfrank@fgllp.com
jkleinman@fgllp.com

*Attorneys for the Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-23007-rdd<br><br>Jointly Administered |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PEPSICO, INC., *et al.*,<br><br>Defendants. | Adv. Proc. No. 18-08245 (RDD)<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE THROUGH FOUR AND PARTIAL SUMMARY JUDGMENT ON COUNTS FIVE THROUGH TWENTY-FIVE** |

---

[1] The Debtors are: 2008 Broadway, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; A&P Live Better, LLC; A&P Real Property, LLC; APW Supermarket Corporation; APW Supermarkets, Inc.; Borman's, Inc.; Delaware County Dairies, Inc.; Food Basics, Inc.; Kwik Save Inc.; McLean Avenue Plaza Corp.; Montvale Holdings, Inc.; Montvale-Para Holdings, Inc.; Onpoint, Inc.; Pathmark Stores, Inc.; Plainbridge LLC; Shopwell, Inc.; Super Fresh Food Markets, Inc.; The Old Wine Emporium of Westport, Inc.; Tradewell Foods of Conn., Inc.; and Waldbaum, Inc. (collectively, the "**Debtors**").

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

I.    INTRODUCTION .......................................................................................................... 1

II.   BACKGROUND ............................................................................................................ 2

III.  ARGUMENT .................................................................................................................. 5

    1.    Summary Judgment Standards............................................................................. 6

    2.    The Tolling Agreements Are Unambiguous, Written, Integrated Contracts that Do Not Include the Debtors. ......................................................................... 7

    3.    The Debtors Are Not Third-Party Beneficiaries of the Tolling Agreements........ 13

    4.    The Debtors Are Not the Committee's Successors-in-Interests, Assigns, or Legal Representatives. ....................................................................................... 17

        A.    The Debtors Are Not the Committee's Successors-in-Interests. .............. 19

        B.    The Debtors Are Not the Committee's Assigns. ..................................... 23

        C.    The Debtors Are Not the Committee's Legal Representatives................. 24

    5.    Equitable Tolling of the Limitations of § 546 is Inappropriate in this Case........ 27

    6.    Two of New York's Statutes of Limitations Partially Bar the Debtors' Contract and Related Claims. ............................................................................ 29

IV.   CONCLUSION............................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.C.E. Elevator Co., Inc. v. Local No. 1, Int'l Union of Elevator Constructors (In re A.C.E. Elevator C*o., Inc.),
 2009 WL 3255381 (Bankr. S.D.N.Y., Oct. 7, 2009) ............................................................ 27
*Abramson v. Superintendence Co., Inc. (In re Casco Chem. Co.),*
 335 F.2nd 645 (5th Cir. 1964) ............................................................ 25
*Ace Sec. Corp. v. DB Structured Prod., Inc.,*
 25 N.Y.3d 581 (2017) ............................................................ 31
*Advanced Contracting Sol., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46 (In re Advanced Contracting Sol., LLC),*
 582 B.R. 285 (Bankr. S.D.N.Y 2018) ............................................................ 26
*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,*
 106 F.3d 11 (2nd Cir. 1997) ............................................................ 23
*Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH,*
 446 F.3d 313 (2nd Cir. 2006) ............................................................ 7
*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ............................................................ 6, 7
*Andy Warhol Found. For Visual Arts, Inc. v. Fed. Ins. Co.,*
 189 F.3d 208 (2nd Cir. 1999) ............................................................ 20, 21
*Anwar v. Fairfield Greenwich, Ltd.,*
 728 F.Supp.2nd 372 (S.D.N.Y. 2010) ............................................................ 15
*Beazely Ins. Co., Inc. v. ACE Am. Ins. Co.,*
 880 F.3d 64 (2nd Cir. 2018) ............................................................ 18
*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,*
 757 F.2nd 523 (2nd Cir. 1985) ............................................................ 17
*Burnett v. New York Cent. R.R. Co.,*
 380 U.S. 424 (1965) ............................................................ 27, 28
*Caguas Cent. Sav. Ban*k v. U.S.,
 215 F.3d 1304 (Fed. Cir. 2000) ............................................................ 10, 11, 13
*Carreiro v. Rhodes Gill & Co.,*
 68 F.3d 1443 (1st Cir.1995) ............................................................ 19
*Cavalry Constr., Inc. v. WDF, Inc. (In re Cavalry Constr., Inc.),*
 2013 WL 5682741 (Bankr. S.D.N.Y., Oct. 18, 2013) ............................................................ 14
*Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A.,*
 773 F.3d 110 (2nd Cir. 2015) ............................................................ 8
*City of New York v. Turnpike Dev. Corp.,*
 36 Misc.2nd 704 (N.Y. Sup. Ct. 1962) ............................................................ 20
*Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.,*
 10 A.D.2nd 372 (N.Y. App. Div. 1960) ............................................................ 24
*Commodore Int'l Ltd. v. Gould (in re Commodore Int'l Ltd.),*
 262 F.3d 96 (2nd Cir. 2001) ............................................................ 21, 22

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   232 F.3d 153 (2nd Cir. 2000) ................................................................................... 7

*Conn v. GATX Terminals Corp.*,
   18 F.3d 417 (7th Cir. 1994) .................................................................................... 17

*Consol. Edison, Inc. v. Northeast Utils.*,
   426 F.3d 524 (2nd Cir. 2005) .................................................................................. 14

*Custom Co. v. Official Comm. of Unsecured Creditors*,
   2000 WL 765090 (N.D. Ill., June 12, 2000) ........................................................... 28

*E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
   269 F.3d 187 (3d Cir. 2001) .............................................................................. 15, 16

*Ernst & Young v. Matsumoto (In re United Ins. Mgmt.)*,
   14 F.3d 1380 (9th Cir. 1994) .................................................................................. 28

*Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs.)*,
   288 B.R. 701 (Bankr. S.D.N.Y. 2003) ............................................................... 27, 28

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits, Ltd.*,
   726 F.3d 62 (2nd Cir. 2013) .............................................................................. 24, 25

*Feder Kaszovitz LLP v. Rosen*,
   2018 WL 3708662 (S.D.N.Y., Aug. 3, 2018) ............................................................ 9

*Frazer v. U.S.*,
   49 Fed. Cl. 734 (Fed. Cl. 2001) ......................................................................... 11, 14

*Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*,
   310 F.3d 64 (2nd Cir. 2002) ................................................................................... 22

*Gordon-Oliver v. Wiesner Prods., Inc. (In re Ryan & Jane, Ltd.)*,
   2016 WL 3742005 (Bankr. S.D.N.Y., July 5, 2016) ................................................ 25

*Gracie Tower Realty Assoc. v. Danos Floral Co., Inc.*,
   142 Misc.2nd 920 (N.Y. Civ. Ct. 1989) ....................................................... 20, 22, 23

*Hudson Energy Services, LLC. v. Great Atlantic & Pacific Tea Co., Inc. (In re Great Atlantic & Pacific Tea Co., Inc)*,
   538 B.R. 666 (S.D.N.Y. 2015) ................................................................................ 30

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
   252 F.3d 608 (2nd Cir. 2001) ................................................................................. 18

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
   889 F.2nd 1274 (2nd Cir. 1989) ........................................................................ 18, 19

*In re Barney's, Inc.*,
   197 B.R. 431 (Bankr. S.D.N.Y. 1996) ............................................................... 26, 27

*In re Cenargo, PLC*,
   294 B.R. 571 (Bankr. S.D.N.Y. 2003) .................................................................... 27

*In re Dynegy, Inc. Securities Litigation*,
   339 F.Supp.2nd 804 (S.D. Texas 2004) ............................................................. 11, 12

*In re Erving Indus., Inc.*,
   432 B.R. 354 (Bankr. Mass. 2010) ......................................................................... 30

*In re Johns-Manville Corp.*,
   36 B.R. 743 (Bankr. S.D.N.Y. 1984) ...................................................................... 25

*In re: Initial Public Offering Securities Litigation*,
   241 F.Supp.2nd 281 (S.D.N.Y. 2003) ..................................................................... 17

*Ins. Co. of Am. v. Dorinco Reinsurance Co.,*
   917 F.2nd 100 (2nd Cir. 2000)..............................................................................8, 9

*Keller Found. LLC v. Zurich Am. Ins. Co.,*
   758 Fed. Appx. 22 (2nd Cir. 2018)......................................................................14, 15

*Kese Indus. v. Roslyn Torah Found.,*
   15 N.Y.3d 485 (N.Y. 2010) ...........................................................................................25

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
   595 F.3d 458 (2nd Cir. 2010)...........................................................................................8

*Longo v. KeyBank Nat'l Assoc.,*
   357 F.Supp.3d 263 (S.D.N.Y. 2019)............................................................................31

*Manufacturers Hanover Trust Co. v. Yanakas,*
   7 F.3d 310 (2nd Cir. 1993)..............................................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986).....................................................................................................6, 7

*MCC Proceeds, Inc. v. Whitman & Ransom,*
   1997 WL 289470 (S.D.N.Y., May 30, 1997) .................................................................9

*Mirant Americas Energy Mktg. v. Official Comm. of Unsecured Creditors of Enron Corp.,*
   2003 WL 22327118 (S.D.N.Y., Oct. 10, 2003) ..........................................................26

*Morrissey v. Gen'l Motors Corp.,*
   21 Fed.Appx. 70 (2nd Cir. 2001)....................................................................................8

*Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.,*
   98 F.3d 262 (7th Cir.1996) ...........................................................................................19

*Official Comm. of Equity Sec. Holders of Adelphia Commc'ns, Inc. v. Adelphia Commc'ns Corp.
   (In re Adelphia Commc'ns Corp.),*
   371 B.R. 660 (S.D.N.Y. 2007).................................................................................21, 22

*Official Comm. of Equity Sec. Holders of Adelphia Commc'ns, Inc. v. Official Comm. of
   Unsecured Creditors of Adelphia Commc'ns, Inc. (In re Adelphia Commc'ns, Inc.),*
   544 F.3d 420 (2nd Cir. 2008).............................................................................21, 22, 23

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
   322 F.3d 147 (2nd Cir. 2003)........................................................................................17

*Olin Corp. v. Am. Home Assur. Co.,*
   704 F.3d 89 (2nd Cir. 2012).............................................................................................8

*Piccoli A/S v. Calvin Klein Jeanswear Co.,*
   19 F.Supp.2nd 157 (S.D.N.Y. 1998).............................................................................15

*Premier Capital, LLC v. KMZ, Inc.,*
   464 Mass. 467 (2013) ...................................................................................................19

*PT. Bank Mizuho Indon. v. PT. Indah Kiat Pulp & Paper Corp.,*
   808 N.Y. S.2nd 72 (App. Div. 1st Dep't 2006) ............................................................14

*Resolution Trust Co. v. Bonner,*
   848 F.Supp. 96 (S.D. Texas 1994)............................................................................9, 10

*Sazerac Co., Inc. v. Falk,*
   861 F.Supp. 253 (S.D.N.Y. 1994) ...............................................................................16

*Schumacher v. Richards Shear Co., Inc.,*
   59 N.Y.2nd 239 (1983) .................................................................................................20

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., Inc),*
   423 F.3d 166 ..............................................................................................22, 23, 25

*Solus Alt. Asset Mgmt. LP v. Delphi Auto. PLC (In re DPH Holdings Corp.)*,
    533 B.R. 20 (Bankr. S.D.N.Y. 2016) ........................................................ 6, 7, 8, 13
*Starter Corp. v. Converse, Inc.*,
    1996 WL 706837 (S.D.N.Y., Dec. 3, 1996) ...................................................... 8
*Subaru Distrib. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2nd Cir. 2005)................................................................. 14, 15
*Tavella v. Skanska USA, Inc.*,
    902 N.Y.S.2nd 328 (Sup.Ct. Kings Cty. 2010)....................................................... 14
*Timbol v. Commercial Bank of Kuwait*,
    2000 WL 282886 (S.D.N.Y., March 15, 2000) ...................................................... 28
*Titus v. Wallick*,
    306 U.S. 282 (1939)............................................................................. 23
*Unsecured Creditors Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.)*,
    779 F.2nd 901 (2nd Cir. 1985).................................................................. 21, 22
*Warren v. Garvin*,
    219 F.3d 111 (2nd Cir. 2000)..................................................................... 27
*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2nd Cir. 2000)....................................................................... 7
*Young v. U.S.*,
    535 U.S. 43 (2002).............................................................................. 27, 28

Statutes

11 U.S.C. 101(1)(A) ................................................................................ 26
11 U.S.C. § 101 .................................................................................... 2
11 U.S.C. § 541(a)(1).............................................................................. 24
11 U.S.C. § 546(a)(1)(A) ....................................................................... 1, 24, 27
11 U.S.C. § 1102 .................................................................................. 26
11 U.S.C. § 1103(c)(2)............................................................................. 26
11 U.S.C. § 1103(c)(4)............................................................................. 26
11 U.S.C. §§ 547 and 550 .......................................................................... 2
N.Y. Uniform Commercial Code § 2-725 ........................................................ 1, 30, 32

Rules

Fed. R. Bankr. P. 7056............................................................................. 6
Fed. R. Civ. P. 56................................................................................. 6
Fed. R. Civ. P. 56(c) ............................................................................. 6
Fed. R. Civ. P. 60(b)............................................................................. 25
N.Y. Civil Practice Law § 213 (McKinney 2019) ................................................. 1, 5, 29

Other Authorities

2 Anderson U.C.C. § 2–501:4, at 734 (3d ed. 2004) .............................................. 30
Article 2 of the Uniform  Commercial Code .................................................... 1, 29, 30
H.R. Rep. No. 103–835............................................................................. 28

Defendants PepsiCo, Inc.; Bottling Group, LLC (d/b/a Pepsi Beverages Company and f/d/b/a The Pepsi Bottling Group ); Frito-Lay North America, Inc.; Quaker Sales and Distribution, Inc.; and Muller Quaker Dairy, LLC (collectively "**Pepsi**") respectfully submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## I.     <u>INTRODUCTION</u>

Pepsi is entitled to summary judgment on Counts One through Four of the Debtors' untimely Second Amended Complaint (the "**SAC**"). The preference avoidance and recovery claims in Counts One through Four are time-barred by the limitations on the Debtors' avoiding powers set forth in 11 U.S.C. § 546(a)(1)(A) ("**§ 546**").

Pepsi is further entitled to partial summary judgment on the Debtors' claims in Counts Five through Twenty-Five based on breach of contract, promissory estoppel, and unjust enrichment. To the extent those claims arise under contracts for sale and accrued before April 16, 2014, they are time-barred under Article 2 of the Uniform Commercial Code. *See* N.Y. Uniform Commercial Code § 2-725. To the extent those claims did not arise under contracts for sale and accrued before April 16, 2012, they are time-barred under the State of New York six-year statute of limitations. *See* N.Y. Civil Practice Law § 213 (McKinney 2019).[2]

---

[2] The Debtors allege that "[a]s to the Fifth through Twenty-Sixth Causes of Action set forth below, GAPT requests relief under the applicable common law (or laws) of express and implied contract, unjust enrichment and promissory estoppel, including, but not limited to, the laws of the State of New York." (SAC, ¶ 22). Because the Debtors have not alleged the particulars of the contracts or transactions at issue, Pepsi agrees to the application of New York law for the purpose of this Motion only.

## II.     BACKGROUND

The Debtors, formerly a national grocery store chain, filed their chapter 11 cases on July 19, 2015. (SOF, ¶ 1). On April 16, 2018, well outside the two-year statute of limitations set forth in § 546, the Debtors filed their original complaint initiating this adversary proceeding (the "**Case**") against Pepsi, for, among other things, avoidance and recovery of preferential transfers under sections 547 and 550 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**").(SOF, ¶ 41). The Debtors also sued Pepsi under various contract or contract-related theories involving transactions dating from December 24, 2010 through November 25, 2015. (SOF, ¶¶ 43, 46, 50).

The Debtors were operated by sophisticated businesspeople, some of whom were members of Debtors' management team during the Debtors' prior chapter 11 cases filed in 2010. (SOF, ¶ 4). The Debtors were (and continue to be) represented by experienced counsel. (SOF, ¶ 5).

In May 2016, the Debtors, the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), and certain of the Debtors' secured lenders resolved a dispute by entering into a Global Settlement Agreement (the "**GSA**"). (SOF, ¶ 7). The GSA, a publicly filed, Court-approved document, explicitly provides the mechanism for prosecution of the estates' Avoidance Actions (as defined in § 1 of the GSA). (SOF, ¶¶ 8-10).

Among other things, the GSA provides that the Committee ***shall*** prosecute all Avoidance Actions with representation by the Committee's counsel Pachulski, Stang, Ziehl & Jones LLP ("**Pachulski**") and under supervision of an Oversight Committee composed of one designee each from the Debtors, the Committee, and the secured creditors. (SOF, ¶¶ 9-10, 12). The GSA further provides that if Pachulski has a conflict with respect to an Avoidance Action, the Oversight

Committee "*shall* select alternative counsel for the prosecution of such matter." (Emphasis added). (SOF, ¶ 12).

On June 9, 2017, Pachulski partner Andrew Caine wrote to Pepsi's counsel Jeremy C. Kleinman and Mark Felger stating that the Committee was beginning to prepare preference complaints "given the upcoming 2 year anniversary of the July 19, 2015 petition dates." (SOF, ¶ 19). Mr. Caine proposed a 90-day tolling agreement between Pepsi and the Committee while they discussed resolution of preference claims. (*Id.*).

On June 19, 2017, the Committee and Pepsi entered into a tolling agreement extending statutes of limitation from July 17, 2017 through October 16, 2017 (the "**First Tolling Agreement**"). (SOF, ¶ 20). Pepsi and the Committee agreed to toll and extend the statutes of limitation applicable to "any cause of action brought by the *Committee* against Pepsi" through October 16, 2017. (*Id.* (emphasis added)). Pepsi and the Committee subsequently entered into four more tolling agreements (with the First Tolling Agreement, the "**Tolling Agreements**"), ultimately extending the *Committee's* filing deadline to April 16, 2018. (SOF, ¶¶ 28, 30, 32, 35).

The *Debtors* were not parties to the First Tolling Agreement and the limitations date set by § 546 passed on July 19, 2017 without any tolling agreement between Pepsi and the *Debtors*. (SOF, ¶¶ 20, 24-26). After July 19, 2017, § 546 barred the Debtors from bringing any avoidance action against Pepsi.

The negotiations between Pepsi and the Committee had failed by March 16, 2018. (SOF, ¶ 40). In the meantime, Pachulski, had gained access to certain of Pepsi's confidential, proprietary business information in connection with another case, *In re Haggen Holdings, LLC*, No. 15-11874, pending in the United States Bankruptcy Court for the District of Delaware (the

"**Haggen Case**"). (SOF, ¶¶ 36-40). On March 16, 2018, Pachulski told Pepsi that it had asked the Oversight Committee to engage new counsel in this matter. (SOF, ¶ 40).

Rather than follow the procedure set forth in the GSA for selecting new Committee counsel if Pachulski could not proceed (*see* GSA, § 4(a)), the Debtors "elected to prosecute this adversary proceeding themselves." (SAC, ¶ 8). The Debtors apparently received consent from the Oversight Committee to proceed. (*See id.*).

On April 16, 2018, almost nine months after the § 546 deadline, the law firm Gibbons P.C. ("**Gibbons**"), initially purporting to act on behalf of both the Committee and the Debtors, filed the complaint signed by David N. Crapo that initiated this adversary proceeding. (SOF, ¶ 41).

On April 17, 2018, Mr. Caine wrote to Jeremy Kleinman, counsel for Pepsi, that "Gibbons mistakenly filed the complaint on behalf of the Committee. We have asked that they *change the party* to the Debtors." (Emphasis added). (SOF, ¶ 44). Mr. Caine's message makes clear that the Committee and its counsel understood that the Committee and the Debtors are separate and distinct entities and that only the Debtors were actually party to the adversary proceeding.

On April 23, 2018, the Debtors filed a First Amended Adversary Complaint (the "**FAC**") naming themselves as sole plaintiffs. (SOF, ¶ 45). By this time, both the § 546 statute of limitations and the tolling period for the Committee had passed. (*Id.*).

The Debtors' filing of the FAC and the allegations set forth in paragraphs 7 and 8 demonstrate that the Debtors also understood that the Committee and the Debtors are separate and distinct entities and that only the Debtors were actually party to the adversary proceeding:

> 7. Neither the Settlement Order nor the GSA affords the Committee sole authority or standing to litigate Avoidance Actions on behalf of the Debtors' estates, and neither the

Settlement Order nor the GSA impacts or limits the Debtors' authority and standing to prosecute contractual claims on behalf of their bankruptcy estates.

8. Because this adversary proceeding includes both Avoidance Action and contractual claims against the Defendants, the Debtors have elected to prosecute this adversary proceeding themselves. Counsel for the Committee and the Lenders have consented to the Debtors' prosecution of this adversary proceeding.

(FAC, ¶¶ 7-8). The Debtors reiterated this understanding when they filed the SAC, which included identical allegations, on August 17, 2018. (*See* SAC, ¶¶ 7-8).

The § 546 deadline for the ***Debtors*** to file avoidance actions passed on July 19, 2017. The ***Debtors*** were not parties to the First Tolling Agreement or any of the subsequent Tolling Agreements between Pepsi and the ***Committee***. (SOF, ¶¶ 20, 24-26, 28, 30, 32, 35). The preference counts of the SAC are thus untimely by approximately nine months and summary judgment should be granted in Pepsi's favor on Counts One through Four of the SAC.

In Counts Five through Twenty-Five of the SAC, the Debtors allege liability arising from events or transactions dating back to December 24, 2010. Summary judgment should be granted in Pepsi's favor on each of these counts for liability arising under contracts for sale and accrued before April 16, 2014. *See* N.Y. Uniform Commercial Code § 725 (McKinney 2019). Summary judgment should also be granted in Pepsi's favor on each of these counts for liability not arising under a contract for sale prior to April 16, 2012 in accordance with the six-year statute of limitations under New York law. *See* N.Y. Civil Practice Law § 213 (McKinney 2019).

### III.   ARGUMENT

The basic and undisputable facts material to this Motion are that:

- The § 546 two-year statute of limitations on avoidance actions passed on July 19, 2017;

- In the Tolling Agreements, Pepsi and the Committee agreed to toll the statute of limitations through April 16, 2018 for claims the Committee may bring and that "the Tolling Period shall be excluded from any calculation of any statute of

limitations period applicable to ***any Cause(s) of Action brought by the Committee against Pepsi.***" (Tolling Agreements, § 2)(emphasis supplied)

- Pepsi and the Debtors had no tolling agreement;

- The Debtors filed their original complaint on April 16, 2018, almost nine months after the statutory limit for avoidance actions;

- Certain contract or contract-related claims in Counts Five through Twenty-Five of the SAC are time-barred by New York's four-year statute of limitations under the Uniform Commercial Code (the "**UCC**") and its six-year statute of limitations set forth in its Civil Practice Law; and

- Pepsi did not agree to toll any statute of limitations in connection with the allegations of Counts Five through Twenty-Five.

### 1. *Summary Judgment Standards.*

Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56, which provides that the Court shall grant summary judgment if the movant establishes that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. *Solus Alt. Asset Mgmt. LP v. Delphi Auto. PLC (In re DPH Holdings Corp.)*, 553 B.R. 20, 25 (Bankr. S.D.N.Y. 2016). Once the movant has established the material elements of its claim or defense, the nonmoving party must provide evidence of a genuine issue of material fact to defeat the motion. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. *DPH*, 553 B.R. at 25 (citing Fed. R. Civ. P. 56(c)).

Facts are material if they "might affect the outcome of the suit under the governing law[.]" *DPH*, 533 B.R. at 25 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The motion may not be defeated by conclusory, self-serving or unsupported allegations,

by simply raising metaphysical doubts about a material fact, or by identifying immaterial disputed facts. *DPH*, 533 B.R. at 25 (citing *Anderson*, 477 U.S. at 247–48; *Matsushita*, 475 U.S. at 586; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2nd Cir. 2000), cert. denied, 540 U.S. 811 (2003)).

It is well recognized that "[i]f a claim or defense is predicated on a written, integrated contract, the case may be particularly suited for resolution by summary judgment. The interpretation of an unambiguous contract, and the initial determination of whether the contract is or is not ambiguous, are considered pure questions of law." *DPH*, 533 B.R. at 25 (citing 11 JAMES WM. MOORE ET AL.., MOORE'S FEDERAL PRACTICE ¶ 56.25[1][a] (3d ed. 2015); *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2nd Cir. 2006)).

### 2. The Tolling Agreements Are Unambiguous, Written, Integrated Contracts that Do Not Include the Debtors.

The only argument that the Debtors can make in an attempt to legitimize their untimely filing is that the limitations set forth in § 546 were somehow actually or equitably tolled as to them. However, each of the Tolling Agreements was unambiguously made between and executed by **only** Pepsi and the Committee. (*See* Tolling Agreements). The Tolling Agreements explicitly provide that they are integrated agreements (*see* Tolling Agreements, § 3(e)) that inure only to the benefit of Pepsi, the Committee, and their "successors-in-interests, assigns, and legal representatives." (*See id.*, § 3(c)).

When interpreting a contract, the Court's "primary objective ... is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2nd Cir. 2000). "[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its

provisions." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2nd Cir. 2012) (internal quotation marks omitted). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2nd Cir. 2010) (citations and quotations omitted). "When the terms of a written contact are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *DPH*, 533 B.R. at 26 (quoting *Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 113–14 (2nd Cir. 2015)).

When a contract has been negotiated between "sophisticated, counseled businesspeople" and on its face "is reasonably susceptible to only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *DPH*, 533 B.R at 27. "In such circumstances, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Id.*

Moreover, an integration or merger clause, which each of the Tolling Agreements contains (*see* Tolling Agreements, § 3(e)), should be accepted as the clearest evidence that an agreement is entirely integrated and unambiguous and that parol evidence should not be considered. *Starter Corp. v. Converse, Inc.*, 1996 WL 706837 at *5 (S.D.N.Y., Dec. 3, 1996) (citing *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2nd Cir. 1993)); s*ee also Morrissey v. Gen'l Motors Corp.*, 21 Fed.Appx. 70, 73 (2nd Cir. 2001) ("Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated"); *Inv'r Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2nd 100, 104 (2nd Cir. 2000) (conclusion to bar parol evidence was "particularly appropriate given the Agreement's 'integration clause,' which

provides that the Agreement represents the entire understanding of the parties to the transaction"); *Feder Kaszovitz LLP v. Rosen*, 2018 WL 3708662 at *5 (S.D.N.Y., Aug. 3, 2018) (citing *Dorinco*, 917 F.2nd at 104).

Courts have routinely interpreted tolling agreements by the specific language they contain and the specific parties they include. *See, e.g.*, *MCC Proceeds, Inc. v. Whitman & Ransom*, 1997 WL 289470 at *2-3 (S.D.N.Y., May 30, 1997) (applying the language of the tolling agreement and the identification of the signatories to conclude that the agreement bound a law firm and its individual partners). In *MCC*, the individual partners of a law firm argued that the applicable statute of limitations time-barred a liquidating trustee's malpractice claims against them. *Id.* at *1. The liquidating trustee argued that a tolling agreement, executed by two law firm Executive Committee members, bound each individual partner. The Court read the language of the agreement, which stated that the executing partners had been duly authorized and the agreement was binding on the law firm *and its partners*, to bind both the law firm and the partners individually. *Id.* at *2 (emphasis in original). The court wrote that the plain language of the tolling agreement demonstrated an intent to bind the individual partners. *Id.*

The *MCC* court distinguished *Resolution Trust Co. v. Bonner*, 848 F.Supp. 96, 98-99 (S.D. Texas 1994). *MCC*, 1997 WL 289470 at *2. In *Bonner*, the court granted summary judgment in favor of the individual partners of a law firm where a tolling agreement in a malpractice and breach of fiduciary duty case, signed by a partner on behalf of a law firm and by another partner (the alleged wrongdoer) in his individual capacity, provided that the agreement would be binding on the firm, the individual partner, and "their agents and attorneys." 848 F.Supp. at 98-99. The court noted that only the firm and the individual were named parties to the tolling agreement. *Id.* at 99. Only the firm and the individual were signatories. *Id.* at 98.

Applying the principle that no provision of an agreement should be rendered meaningless, the court noted that the individual partner's signature and inclusion would be rendered meaningless if the agreement were read to include individual partners. *Id.* Importantly, the court stated that "[i]f the individual partners were intended to be bound by the tolling contract, then the parties could easily have included a provision binding '[the firm] and its partners.'" *Id.*

Similarly, in *Caguas Cent. Sav. Bank v. U.S.*, the court looked at the plain language of a tolling agreement and concluded that "on their face" the agreement's provisions applied only to its makers and signatories, the receiver of an insolvent savings and loan company and the United States Department of Justice. 215 F.3d 1304, 1309 (Fed. Cir. 2000). Like the Tolling Agreements in this adversary proceeding (*see* Tolling Agreements, Recitals), the *Caguas* agreement tolled the statute to allow the two parties to attempt an amicable resolution. *See Caguas*, 215 F.3d at 1309. Like the Tolling Agreements, which tolled the limitations on causes of action the Committee might bring (*see* Tolling Agreements, § 2), the *Caguas* agreement tolled the statute for certain claims the receiver "'may possess.'" *See Caguas*, 215 F.3d at 1309 (quoting the tolling agreement). Like Pepsi's agreement not to raise the § 546 limitations as a defense against the Committee (see Tolling Agreements, § 2), the United States agreed to not to raise limitations as a defense to claims brought by the receiver. *See Caguas*, 215 F.3d at 1309. The court noted that there could be no reason that the parties to the tolling agreement would wish to extend the tolling period to third parties—like the Tolling Agreements, the purpose of the *Caguas* tolling agreement was to allow the two parties to the agreement a time to settle amicably, not to allow third parties more time to bring suit. *See id.* at 1310. The *Caguas* court concluded that:

> Nothing in the tolling agreement, however, even suggests, much less establishes, that the parties to it intended to toll the statute of limitations for suits brought by [third parties]. . . .On their face, these provisions toll the statute of limitations only for cases filed by the [receiver] on Goodwill Claims it possesses. They do not toll the statute on

claims filed not by the [receiver], but by former members of an insolvent savings and loans associations on behalf of the association.

*Id.*

The *Caguas* court also rejected the alternative argument that the tolling agreement should be read to include the insolvent savings and loan company because any recovery the receiver obtained would be for the benefit of the receivership estate. *Id.* The court was explicit that "Caguas was not a party to that agreement, and it did not become one merely because any recovery the Resolution Trust Corporation might obtain on Caguas' claims would be for Caguas' benefit." *Id.*

In *Frazer v. U.S.*, the shareholders and directors of another defunct thrift institution filed an untimely derivative action on behalf of the institution, arguing that they could rely on a tolling agreement between and executed by the statutory receiver and the Justice Department. 49 Fed. Cl. 734, 736 (Fed. Cl. 2001). The *Frazer* court wrote that:

> The bank was not a party to this agreement and there is nothing in the text of the agreement to suggest that the bank was intended to be a third-party beneficiary of the agreement. Plaintiffs' position, therefore, is indistinguishable from the litigating position of the shareholder-plaintiffs that was considered and rejected by the court of appeals in *Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304 (Fed.Cir. 2000). Plaintiffs have no standing to invoke the tolling agreement on the bank's behalf.

*Id.*

Following *Caguas* and *Frazer*, the court in the class action *In re Dynegy, Inc. Securities Litigation*, held that a tolling agreement entered into and executed by the corporate defendant and the Lead Plaintiff on behalf of itself and a putative class did not include or cover claims brought by purchasers of securities issued by the defendant's subsidiary. 339 F.Supp.2nd 804, 863-66 (S.D. Texas 2004). Analyzing the plain language of the tolling agreement, the *Dynegy* court found that it applied only to the specific parties it was made among. *Id.* at 865-66. The

court agreed with the defendants that "[g]iven that the agreement expressly addresses only 'Dynegy Inc.' and 'any offering of Dynegy Inc. securities,' there is nothing in the text of the agreement to suggest that a Dynegy Holdings bondholder was intended to be a third-party beneficiary of the agreement." *Id.* at 866 (quotations omitted).

Like the tolling agreements in each of the five cases discussed above, each of the Tolling Agreements was made and executed by two expressly named, sophisticated, counseled parties—Pepsi and the Committee. Only Pepsi and the Committee are defined as "Parties." Only Pepsi and the Committee executed each Tolling Agreement. The penultimate "WHEREAS' clause of each Tolling Agreement refers to the time in which the Committee may bring an Avoidance Action. The final "WHEREAS" clause states that "the Parties desire to continue to investigate and potentially resolve any Causes of Action that the ***Committee*** may otherwise commence against Creditors without the need for litigation." (Tolling Agreements (emphasis added)).

Each of the five Tolling Agreements is clearly and unambiguously made between and executed only by Pepsi and the Committee, and it was only Pepsi and the Committee who "hereby stipulate[d] and agree[d]" (Tolling Agreements, p. 2). Section 2 of each Tolling Agreement provides that:

> In consideration of the ***Committee's*** Covenant Not to Sue (as set forth in paragraph 1 of this Stipulation), [Pepsi] agree[s] that all statutes of limitation that have not otherwise already run including but not limited to those set forth in Section 546 of the Bankruptcy Code, applicable to any Cause(s) of Action that the ***Committee*** may bring against [Pepsi] are hereby extended from the Commencement Date through and including April 16, 2018 (the "Tolling Period"), and the Tolling Period shall be excluded from any calculation of any statute of limitations period applicable to any Cause( s) of Action brought by the ***Committee*** against [Pepsi]. [Pepsi] acknowledge[s] that it will be estopped hereby from arguing that this Stipulation is ineffective to extend the time within which the ***Committee*** must commence an action to pursue the Causes of Action.

(Tolling Agreements (emphasis added)). This language (approved by the Oversight Committee on which the Debtors had a designee pursuant to the GSA) unambiguously tolls the statutes of

limitations applicable only "to any Cause(s) of Action brought by the Committee against Pepsi." It does not specifically include, and should not be interpreted as impliedly including, a tolling period for the Debtors. *See DPH*, 533 B.R at 27 (stating that "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include").

To paraphrase the *Caguas* court, the Tolling Agreements were unambiguously intended to allow Pepsi and the Committee time to negotiate a settlement and there is no reason to think or read into the Tolling Agreements an intent that they should prolong Pepsi's exposure to avoidance claims by any party other than the expressly-bargained-for Committee. To further paraphrase the five cases discussed above, had Pepsi and the Committee intended to toll the statute for the Debtors as well, it would have taken only three little words: "and the Debtors."

Nor can the fact that any recovery on Avoidance Actions (whether prosecuted by the Committee or by the Debtors) would benefit the Debtors' estates support reading the Debtors into the Tolling Agreements. The Debtors were not party to the Tolling Agreements and, to follow *Caguas*, they did not become parties just because part of any recovery the Committee might have obtained would have been for benefit of the bankruptcy estates.[3] *See Caguas*, 215 F.3d at 1309.

### 3. The Debtors Are Not Third-Party Beneficiaries of the Tolling Agreements.

As discussed above, the *Caguas* and *Frazer* courts also concluded that the tolling agreement expressly made and executed between only two named parties did not create any third-party beneficiaries. *See id.* (explaining that "for there to be third party beneficiaries the

---

[3] The GSA provides a graduated split of the proceeds of the Avoidance Actions between the bankruptcy estates and the secured lenders that are party to the GSA. The first $10 million is to be split 75% to the secured lenders and 25% to the estates. Proceeds between $10 million and $18 million will be split 50/50. Proceeds in excess of $18 million will go 100% to the estates. (GSA, ¶ 4(b)).

contract must reflect the express or implied intention of the parties to benefit the third party."
(citations and quotations omitted); *Frazer*, 49 Fed. Cl. at 736 (stating that "there is nothing in the
text of the agreement to suggest that the bank was intended to be a third-party beneficiary of the
agreement").

This Court has written that "[i]t is generally recognized that the intent to confer a direct
benefit on an unnamed third party must clearly appear for that party to be a third party
beneficiary of a contract between others." *Cavalry Constr., Inc. v. WDF, Inc. (In re Cavalry
Constr., Inc.)*, 2013 WL 5682741 at *10 (Bankr. S.D.N.Y., Oct. 18, 2013) (citing *PT. Bank
Mizuho Indon. v. PT. Indah Kiat Pulp & Paper Corp.*, 808 N.Y. S.2nd 72, 73 (App. Div. 1st
Dep't 2006) (there must be a "clear intention to confer the benefit of the promised
performance"); *Tavella v. Skanska USA, Inc.*, 902 N.Y.S.2nd 328, 332 (Sup.Ct. Kings Cty.
2010) ("It is the generally accepted rule that the intent to confer a direct benefit on a third party
must clearly appear in order to enable such a party, not named in the contract, to recover
thereunder."); *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 528 (2nd Cir. 2005) ("To
create a third party right to enforce a contract, the language of the contract must *clearly* evidence
an intent to permit enforcement by the third party.") (emphasis in original)). That clear intention
must be shown on the face of the agreement. *Cavalry Constr.*, 2013 WL 5682741 at *10. A
contractual requirement that the promisor render performance directly to the third party shows an
intent to benefit the third party. *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124
(2nd Cir. 2005).

Conferral of the third-party benefit must be a material part of the agreement's purpose.
*Keller Found. LLC v. Zurich Am. Ins. Co.*, 758 Fed. Appx. 22, 26-27 (2nd Cir. 2018). It is not
enough that the party claiming third-party beneficiary status might, or even did, receive a benefit

from the agreement in question. *Id.* (citing *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196-97 (3d Cir. 2001) ("Although [the parent company] . . . would certainly benefit from the success of [its subsidiary], [the parent company] was not an intended third party beneficiary of the Agreement any more than any parent who expects to benefit from the success of the business ventures of its subsidiary.")).

In *Subaru*, the court considered multiple provisions of the contract and concluded that the contract on its face "strongly suggested" that the parties intended to "concern and benefit only themselves." 425 F.3d at 125. The court considered the recitals to the agreement, which, like the recitals in the Tolling Agreements, failed to mention any purpose of benefitting anyone else. *Id.* The court considered the agreement's stated purpose, which was to "set forth the functions and responsibilities of the parties hereto" and did not include third parties. *Id.* The Tolling Agreements also set forth the functions and responsibilities of the Parties, identified as Pepsi and the Committee, and do not include third parties. (See Tolling Agreements, §§ 1-2). In essence, the *Subaru* court found that contractual language that does not include third parties suggests that the contracting parties did not intend to extend contractual rights to anybody else. *Id.*

In other cases, courts have considered inurement clauses and found that those also suggest that no third-party beneficiary was intended. *See, e.g., Anwar v. Fairfield Greenwich, Ltd.*, 728 F.Supp.2nd 372, 429 (S.D.N.Y. 2010) (quoting *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2nd 157, 163 (S.D.N.Y. 1998) ("the specification that the contract inures to the benefit of and binds the parties ... makes plain the parties' intention to preclude third-party enforcement")). In *Sazerac Co., Inc. v. Falk*, the court found that an inurement clause stating that "[t]his Agreement shall be binding upon and inure to the benefit of the parties to this Agreement

and their respective successors and permitted assigns" barred third-party beneficiary claims. 861 F.Supp. 253, 258 (S.D.N.Y. 1994) (collecting cases).

As discussed in greater detail below, *see infra*, pp. 20-30, the Tolling Agreements contain inurement clauses that strictly limit the tolling benefits to the Committee's "successors-in-interests, assigns, and legal representatives." (Tolling Agreements, § 3(c)). These three terms are legal terms of art that, by their definitions, cannot be applied to the Debtors' relationship to the Committee. *See infra, pp.* 20-30 (discussing the meanings of the terms "successor in interest," "assign," and "legal representative").

The Tolling Agreements on their faces make plain that Pepsi and the Committee intended to concern and benefit only themselves. The Tolling Agreements' stated purpose was to allow Pepsi and the Committee to attempt to negotiate a settlement without the need for litigation (Tolling Agreements, Recitals). Pepsi and the Committee exchanged consideration solely between themselves—the Committee gave Pepsi a covenant not to sue (*Id.*, § 1) and Pepsi tolled the statute of limitations as to any causes of action brought by the Committee against Pepsi. (*Id.*, § 2).

While the Tolling Agreements do not have non-assignment or arbitration clauses, they do have "entire agreement" (*id.*, § 3(e)) and "legal fees and costs" (*id.*, § 3(h)) clauses that have similar effects. The Tolling Agreements also have inurement clauses, similar to those discussed in *Anwar, Piccoli*, and *Sazerac*, stating that "[t]his Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party," none of which can be construed to include the Debtors.

In this Case, even though, like a parent from its subsidiary, the Debtors' estates would "certainly benefit", *see DuPont*, 269 F.3d at 196-97 (stating that receipt of a certain benefit does

not create third-party beneficiary status), from the Committee's successful prosecution of the Avoidance Actions, the Debtors are not intended third-party beneficiaries of the Tolling Agreement. Nothing on the face of the Tolling Agreements shows any such intent between Pepsi and the Committee.

4. **The Debtors Are Not the Committee's Successors-in-Interests, Assigns, or Legal Representatives.**

Because the Debtors are not Parties to the Tolling Agreements or third-party beneficiaries, the only remaining avenue to claiming the Committee's benefits under the Tolling Agreements is as the Committee's "successors-in-interests, assigns, or legal representatives" under the Tolling Agreements' inurement provisions. (*See* Tolling Agreements, § 3(c) (providing that "[t]his Stipulation shall inure to the benefit of, and be binding upon, any and all successors-in-interests, assigns, and legal representatives, of any Party")). The "successors-in-interests, assigns, or legal representatives" are expressly the only entities, other than the Committee and Pepsi, to whom the benefits of the Tolling Agreements inure.

However, the Debtors have admitted that they have concurrent standing with the Committee (FAC ¶ 8; SAC, ¶ 8). An allegation stated in a complaint is a judicial admission by which the plaintiff must be bound throughout the course of this proceeding. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2nd Cir. 2003); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2nd 523, 528 (2nd Cir. 1985). "Plaintiffs may even plead themselves out of court at the outset of their lawsuit by pleading information that defeats their legal claim." *In re: Initial Public Offering Securities Litigation*, 241 F.Supp.2nd 281, 324 (S.D.N.Y. 2003) (citing *Conn v. GATX Terminals Corp.*, 18 F.3d 417, 419 (7th Cir. 1994)).

The Debtors have admitted that:

> Neither the Settlement Order nor the GSA affords the Committee sole authority or standing to litigate Avoidance Actions on behalf of the Debtors' estates, and neither the Settlement Order nor the GSA impacts or limits the Debtors' authority and standing to prosecute contractual claims on behalf of their bankruptcy estates.

(FAC, ¶ 8; SAC, ¶ 8). Also, as discussed below (*see infra,* 24-26, discussing standing), the Debtors have concurrent standing with the Committee even without their admissions in the FAC and SAC.

The Debtors' concurrent standing with the Committee and the specific terms of the Tolling Agreements must inform the Court's determination of whether the Debtors can be considered as "successors-in interests, assigns, or legal representatives" of the Committee for purposes of the Tolling Agreements. A court will always "begin with the terms of the contract itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2nd Cir. 2001). A definition provided in the contract explicitly specifies the meaning of a term. *Id.* However, the terms "successors-in-interests, assigns, or legal representatives" are not defined in the Tolling Agreements.

Failure to define a term does not necessarily trigger an ambiguity. *Id.* at 618. "In the absence of guidance from the contract's language, courts ask whether a body of law or an established custom or usage provides a definition." *Beazely Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 69 (2nd Cir. 2018). "It is quite possible that even where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters." *Hugo Boss*, 252 F.3d at 617. "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2nd 1274, 1277 (2nd

Cir. 1989) (quotations and citations omitted). When a term has a commonly understood meaning in the context of the contract, a court should not impose other limitations or connotations. *See id.* (discussing the term "booking" in context of the freight carriage industry and rejecting a meaning other than the one "commonly understood").

The Tolling Agreements in context are contracts negotiated between the duly appointed Creditors Committee in a corporate chapter 11 bankruptcy case and corporate potential defendants to a preference action, each side represented by counsel, and drafted by counsel for the Committee. They are contracts prepared by lawyers for opposing lawyers so that the Committee and Pepsi could attempt to avoid litigation and reach an amicable settlement. They are, in fact, even executed by the lawyers as attorneys for their respective clients.

Therefore, the terms "successors-in-interests," "assigns," and "legal representatives" should be considered: 1) as lawyers would commonly use or understand them; 2) as having their reasonable and ordinary meaning when used by lawyers; and 3) as a body of law or established custom has defined them. The Debtors are not "successors-in-interests, assigns, or legal representatives" under any of these analyses. The terms are legal terms of art and should be construed as such.

A.      The Debtors Are Not the Committee's Successors-in-Interests.

A "successor in interest" is "[s]omeone who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance." BLACK'S LAW DICTIONARY, (11th ed. 2019). "In order for one corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets." *Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013) (quoting *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.,* 98 F.3d 262, 266 (7th Cir.1996)); *see also Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446-47 (1st Cir.1995)

(finding that defendant, an alleged successor in interest, was entitled to judgment as a matter of law where it could not be a successor in interest where there was no transfer of assets or shares of stock). The Court of Appeals of New York has found a corporation to be a "successor" as a result of a transaction that was "in substance" a sale of all assets and the seller discontinued operations. *Schumacher v. Richards Shear Co., Inc.* 59 N.Y.2nd 239, 244 (1983).

Further, to become a "successor in interest" the transferee must "retain the same rights as the original owner." *City of New York v. Turnpike Dev. Corp.*, 36 Misc.2nd 704, 706 (N.Y. Sup. Ct. 1962). There cannot be a change in the substance of the transferred rights. *Id.* A "successor in interest" cannot hold greater rights in the transferred property than the transferee held. *Gracie Tower Realty Assoc. v. Danos Floral Co., Inc.*, 142 Misc.2nd 920, 923-24 (N.Y. Civ. Ct. 1989) (discussing *Turnpike Dev.*, 36 Misc. 2nd at 706).

In other words, to create a "successor in interest" the predecessor must transfer all or substantially all of its assets to the successor. There must be assets that belonged to the predecessor and there must have been a transfer. *See Turnpike Dev.*, 36 Misc.2nd at 706-07 (finding that the defendant could not be a "successor in interest" where there "was not even a transfer from either of the contracting parties to the defendant"). After the transfer, the transferee must hold the same rights that the transferor used to hold and not greater or lesser rights.

Given their concurrent standing and possession of the claim against Pepsi, the Debtors cannot be the Committee's "successors-in-interests." *See Andy Warhol Found. For Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 217 (2nd Cir. 1999) (holding that a person who possesses a concurrent interest with another party cannot be that other party's successor in interest). Since the Debtors have uninterruptedly held a claim against Pepsi and the standing to bring it, the

Committee had nothing to transfer to the Debtors and the elements essential to the creation of a "successor in interest" are missing.

In *Warhol*, the Second Circuit held that Time, Inc. ("**Time**"), which held a concurrent copyright with the photographer who photographed Jackie Kennedy at her husband's funeral, could not be included as the photographer's heir or assign in a tolling agreement solely between the photographer and the Warhol Foundation. *Id.* Having the concurrent claim meant that Time could not be a successor. *Id.*

Likewise, the Debtors, who have concurrent standing with the Committee cannot be deemed to be the Committee's successors-in-interests. Their standing does not flow from a transfer by the Committee but co-exists with the Committee's own standing conferred in the GSA and authorized by this Court.

Further, any alleged transfer from the Committee to the Debtors would result in a change in substance because the Debtors' rights would be greater than the Committee's. The Committee's standing is merely derivative and must be obtained by approval of court. *See, e.g. Official Comm. of Equity Sec. Holders of Adelphia Commc'ns, Inc. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 666-67 (S.D.N.Y. 2007). A committee has only an "implied but qualified right" to initiate adversary proceedings, subject to court approval. *Unsecured Creditors Comm. of Debtor STN Enters. v. Noyes (In re STN Enters.)*, 779 F.2nd 901, 904 (2nd Cir. 1985). If granting derivative standing will be beneficial to and in the best interests of the estate, *Commodore Int'l Ltd. v. Gould (in re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2nd Cir. 2001), it will be granted to a committee under three circumstances. *See, e.g. Official Comm. of Equity Sec. Holders of Adelphia Commc'ns, Inc. v. Official Comm. of Unsecured Creditors of Adelphia Commc'ns, Inc. (In re Adelphia Commc'ns, Inc.)*, 544 F.3d 420, 423-24 (2nd Cir. 2008)

*aff'g* 371 B.R. 660.423-24 (laying out the history of committee derivative standing). First, where the debtor has unjustifiably failed to bring suit. *STN*, 779 F.2nd at 904-05. Second, where the debtor consents. *Commodore Int'l*, 262 F.3d at 100. Third, where the debtor and the committee both act as plaintiffs. *Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64, 71 (2nd Cir. 2002).

Committee derivative standing may be revoked by court order. *Adelphia Commc'ns*, 544 F.3d at 423. Court-conferred derivative standing does not transfer ownership and control of claims to a committee. *Id.* at 423-25; *see also Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., Inc)*, 423 F.3d 166, 180-83 (explaining that a grant of derivative standing does not confer ownership of the causes of action).

On the other hand, the Debtors' standing to sue on behalf of their estates is expressly authorized by the Bankruptcy Code. *Adelphia Commc'ns*, 544 F.3d at 423. A debtor-in-possession has the sole statutory authority to act as the estate's legal representative and to hold and be accountable for property of the estate. *See, e.g., Smart World*, 423 F.3d at 175 (setting forth the statutory role and duties of a debtor-in-possession); *see also Adelphia Commc'ns*, 544 F.3d at 424 (comparing the rights of control over causes of action between a committee with court-approved derivative standing and a debtor-in-possession's statutory role).

In *Gracie Tower*, the court considered, as a matter of first impression, whether a property management company that had first lost control of its real property to a receiver appointed in a foreclosure action and then regained it through a chapter 11 filing could be the receiver's successor in interest under the "form and substance" test. 142 Misc.2nd at 923. The court compared the limited powers and duties of the receiver, whose authority arose entirely from a court order, with those of an owner in fee simple absolute. *Id.* The receiver had narrow authority

as a custodian to "preserve and protect" the property but did not hold title or have other rights associated with ownership. *Id.* at 924. There was no change in form as a result of the transfer—both the receiver and the owner performed the same administrative duties, such as collecting rent. *Id.* However, the court found that the transfer from the receiver back to the owner resulted in a change in substance because the owner "obtained far greater rights than the receiver ever had" including "control consistent with ownership." *Id.* Under these circumstances, the court held that the owner was not a successor in interest "but rather a mere transferee." *Id.*

In this Case, the Committee has limited authority similar to that of the receiver in *Gracie Tower*, while the Debtors' authority is similar to that of the property owner. Neither element that creates a successor in interest, a transfer without a resulting change in substance, is present here. The Committee could not transfer anything to the Debtors because the Debtors never lost their rights. Even assuming, *arguendo*, that the Committee could transfer its derivative rights to sue Pepsi to the Debtors, the transfer would create a change in substance. The Committee could transfer only its derivative standing and its limited rights to the Debtors, who have, and would continue to have, full statutory standing and all that goes with their "central role as the estate's 'legal representative.'" *See Adelphia Commc'ns*, 544 F.3d at 424 (quoting *Smart World*, 423 F.3d at 173-74, 183). Consequently, the Debtors cannot be the Committee's "successor-in-interests" and the Tolling Agreements do not inure to the Debtors' benefit. (*See* Tolling Agreements, § 3(c)).

B.    The Debtors Are Not the Committee's Assigns.

An "assignment" is a "transfer of rights or property." BLACK'S LAW DICTIONARY, (11th ed. 2019). To make a valid assignment, "the owner must manifest 'an intention to make the assignee the owner of [the] claim.'" *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2nd Cir. 1997) (quoting *Titus v. Wallick*, 306 U.S. 282, 288-89 (1939)).

While no special form of words is necessary to effect an assignment it is requisite that there be a perfected transaction between the parties, intended to vest in the assignee a present right in the things assigned. An assignment at law contemplates templates (sic) a completed transfer of the entire interest of the assignor in the particular subject of assignment, whereby the assignor is divested of all control over the thing assigned.

*Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 10 A.D.2nd 372, 376 (N.Y. App. Div. 1960).

The Committee cannot make the Debtors the owners of the claim against Pepsi—that claim belongs to the bankruptcy estates by virtue of § 541(a)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(1). The only thing that the Committee could conceivably transfer to the Debtors is the Committee's standing to prosecute Avoidance Actions.

However, as discussed above, the Committee and the Debtors have concurrent standing to bring Avoidance Actions. The Committee has only derivative standing while the Debtors have full statutory standing. Therefore, the Committee cannot transfer standing to the Debtors—the Debtors already had it, and to a greater degree than the Committee, at the time of the expiration of the statute of limitations under 11 U.S.C. § 546. Under these circumstances, the Debtors cannot be the Committee's assigns because there is nothing for the Committee to assign.

C.       The Debtors Are Not the Committee's Legal Representatives.

A "legal representative" is "[s]omeone who manages the legal affairs of another because of incapacity or death, such as the executor of an estate." BLACK'S LAW DICTIONARY, (11th ed. 2019). It may refer to an executor or administrator who acts for a deceased person or to a trustee who acts for a party who, by reason of law or agreement, cannot act for itself. *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits, Ltd.*, 726 F.3d 62, 80-82 (2nd Cir. 2013) (holding that, for purposes of the Lanham Act, a "legal representative" is one who has legal authority to represent another who is legally incapable of representing itself). A "legal representative" is not

an agent of a party "but a principal who has been assigned the rights and obligations of the party." *Kese Indus. v. Roslyn Torah Found.*, 15 N.Y.3d 485, 490 (N.Y. 2010).

> Consistent with this definition, this Court, going back to the late 1800's, has held the words "legal representatives" mean ordinarily executors or administrators, and that meaning will be attributed to them in any instance unless there be facts existing which show that the words were not used in their ordinary sense, but to denote some other and different idea. . . . This definition of "legal representative" corresponds with the case law of virtually every other state and federal court that has defined the term.

*Id.* at 490-91 (internal quotations and citations omitted).

In the context of bankruptcy cases, a bankruptcy trustee has been held to be a "legal representative." *See Gordon-Oliver v. Wiesner Prods., Inc. (In re Ryan & Jane, Ltd.)*, 2016 WL 3742005 at * 2 (Bankr. S.D.N.Y., July 5, 2016) (citing *Smart World*, 423 F.3d at 174)); *see also Fed. Treasury Enters.*, 726 F.3d at 80 (citing *Abramson v. Superintendence Co., Inc. (In re Casco Chem. Co.)*, 335 F.2nd 645, 651 (5th Cir. 1964) (holding that a bankruptcy trustee is a "legal representative" for purposes of Fed. R. Civ. P. 60(b)). Bankruptcy courts have also appointed "legal representatives" to protect the interests of unknown or future claimants affected by a debtor's reorganization proceedings, precisely because those claimants cannot act for themselves.

> Thus, because none of the existing committees of unsecured creditors and present asbestos claimants represents this key group, a separate and distinct representative for these parties in interest must be established so that these claimants have a role in the formulation of such a plan. This is especially so given that any plan of reorganization must necessarily balance the rights and needs of prepetition creditors against the anticipated rights and needs of postpetition creditors with Manville's purportedly limited assets and further economic prospects apportioned accordingly.

*In re Johns-Manville Corp.*, 36 B.R. 743, 749 (Bankr. S.D.N.Y. 1984) (footnote omitted).

The Debtors are not the Committee's "legal representatives" if for no other reason than because the Committee was perfectly capable of acting for itself within the agreed-upon tolling period with Pepsi. The Committee has demonstrated its competence to act in this bankruptcy

case by filing approximately thirty other adversary proceedings. (*See* Bankr. Dkt. Nos. 3685-3694; 3696-398; 3700-3713). Even the slight impediment of finding a law firm other than Pachulski cannot reasonably be viewed as rendering the Committee incapable of action—obviously the Debtors were able to find attorneys to act for them, even if belatedly. The Debtors are also bound by their pleadings, wherein they alleged that they "elected to prosecute this adversary proceeding themselves" (FAC ¶ 8; SAC ¶ 8), and not that the Committee was unable to proceed.

Moreover, it would be logically inconsistent to consider the Debtors as the Committee's "legal representatives." The Committee itself is a legal representative of all unsecured creditors, *see, e.g.*, *Mirant Americas Energy Mktg. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 WL 22327118 at *1, *4, *6 (S.D.N.Y., Oct. 10, 2003) (discussing the duties of an unsecured creditors' committee and stating that it is "fundamental that a committee represents all unsecured creditors"), which the Bankruptcy Code defines as any "entity that has a claim ***against the debtor*** that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(1)(A) (emphasis added). The Committee and its members have a fiduciary duty to "all creditors represented by the committee." *In re Barney's, Inc.*, 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996). The Committee is a statutory entity, 11 U.S.C. § 1102, granted "broad consultation and investigative powers" for the protection of the unsecured creditors. *See, e.g.*, *Advanced Contracting Sol., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46 (In re Advanced Contracting Sol., LLC)*, 582 B.R. 285, 304 (Bankr. S.D.N.Y 2018). Among the powers and duties of a committee are the powers to ***investigate*** the debtor, 11 U.S.C. § 1103(c)(2) (emphasis added), and to request the appointment of a trustee, 11 U.S.C. § 1103(c)(4), whose appointment would dispossess the debtor. A committee owes no duty to the debtor or its estate.

*Barney's*, 197 B.R. at 441; *see also A.C.E. Elevator Co., Inc. v. Local No. 1, Int'l Union of Elevator Constructors (In re A.C.E. Elevator Co., Inc.)*, 2009 WL 3255381 at * 4 (Bankr. S.D.N.Y., Oct. 7, 2009) (citing *Barney's*, 197 B.R. at 441). A debtor, on the other hand, owes fiduciary duties to the estate and all parties in interest. *See, e.g.*, *In re Cenargo, PLC*, 294 B.R. 571, 597-98 (Bankr. S.D.N.Y. 2003).

The Committee's duties and the Debtors' duties are incompatible; one has duties to all unsecured creditors and the other has duties to all parties in interest, including but not limited to the unsecured creditors. The two sets of duties cannot be regarded as the same, even though they have some overlap. The Committee is statutorily empowered to represent those with claims **against** the Debtor and to act in a manner adversarial to the Debtors, if necessary. The Debtor, with its fiduciary duties to multiple entities other than its unsecured creditors, cannot stand in the Committee's shoes in any way that is consistent with the fiduciary duties of either entity. Therefore, the Debtors cannot be the Committee's "legal representatives."

5. ***Equitable Tolling of the Limitations of § 546 is Inappropriate in this Case.***

Equitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity. *Warren v. Garvin*, 219 F.3d 111, 113 (2nd Cir. 2000). Equitable tolling has been allowed where "the claimant has actively pursued his judicial remedies by filing a defective pleading within the period of limitations, or has been induced or tricked by his adversary into permitting the deadline to pass." *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs.)*, 288 B.R. 701, 704 (Bankr. S.D.N.Y. 2003) (citing *Young v. U.S.*, 535 U.S. 43, 50 (2002)). Equitable tolling is favored where plaintiff has "not slept on its rights and commences a timely state court action in a court of competent jurisdiction, and the particular defect in the complaint is waivable and frequently waived." *Randall's Island*, 288 B.R. at 705 (citing *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 429 (1965)). The doctrine

of equitable tolling also applies in cases of fraud, *see Randall's Island*, (citing H.R. Rep. No. 103–835, at 23 (1994), U.S. Code Cong. & Admin. News 1994, at 3340)). It has been applied in bankruptcy where, despite the exercise of due diligence, the plaintiff has been prevented from filing a timely pleading. *Randall's Island*, 288 B.R. at 705 (citing *Custom Co. v. Official Comm. of Unsecured Creditors*, 2000 WL 765090 at *2 (N.D. Ill., June 12, 2000)). It has been applied where clerical errors caused a filing to become untimely. *Timbol v. Commercial Bank of Kuwait*, 2000 WL 282886 at *3 (S.D.N.Y., March 15, 2000). In *Young*, the Supreme Court equitably tolled a statute of limitations where the automatic stay in the debtors' serial chapter 13 and 7 filings prevented the Internal Revenue Service from timely protecting its claim. 535 U.S. at 50-51.

The common thread that runs through all these cases is that the plaintiff, ***through no active choice or fault of its own***, filed an untimely complaint. These cases are different from the case where a debtor's own choices or actions lead to an untimely filing. A debtor-in-possession's failure to act diligently and expeditiously nullifies its right to invoke the doctrine of equitable tolling. *Ernst & Young v. Matsumoto (In re United Ins. Mgmt.)*, 14 F.3d 1380, 1386-87 (9th Cir. 1994). Where the defendant could and did rely on the statute of limitations because it was not aware that the plaintiff was actively pursuing its remedies, application of equitable tolling would be unjust. *See Burnett*, 380 U.S. at 42-30.

In this Case, the Debtors' own choices nullify any right they may have to invoke equitable tolling. They acted neither diligently nor expeditiously. They elected to allow the Committee to prosecute the Avoidance Actions and to negotiate with Pepsi for the entire limitations period. As the period drew to a close, the Committee, and not the Debtors, approached Pepsi to ask for a tolling agreement. For almost an additional nine months after the

close of the limitations period, the Debtors allowed the Committee to negotiate with Pepsi and enter into the five separate Tolling Agreements with Pepsi.

Pepsi was aware that the Debtors had contractually agreed that the Committee would prosecute the Avoidance Actions with Pachulski as counsel or with substitute counsel to be selected by the Oversight Committee. Having entered into *five* timely Tolling Agreements with the ***Committee***, and none with the ***Debtors***, Pepsi had every reason to rely on the limitations set forth in § 546 because the ***Committee***, and not the ***Debtors***, was pursuing the Avoidance Actions.

The Debtors were aware of the Tolling Agreements and the expiration of the § 546 limitations period by virtue of their designee on the Oversight Committee, their own experience in bankruptcy, and their experienced counsel. However, in the Debtors' own words, they nevertheless "elected to prosecute this Action themselves." (SAC, ¶ 8).

As mentioned previously, the Debtors would only have been covered had both parties included three little words ("and the Debtors").  Instead, the Debtors, aware of the circumstances, apprised of the statutory deadlines, and represented by experienced counsel, allowed the § 546 limitations date to pass without ever making such a request. Consequently, Counts One through Four of the SAC are untimely.

### 6.  *Two of New York's Statutes of Limitations Partially Bar the Debtors' Contract and Related Claims.*

Section 213 of the New York Civil Practice Law and Rules provides that actions on express or implied contracts, except as provided by Article 2 of the UCC or New York's statutes regarding warranties on the sale of new homes, and actions for which no limitation is specifically prescribed by law must be commenced within six years. *See* N.Y. Civil Practice Law § 213 (McKinney 2019). Under the UCC, actions for breach of contract for sale must be commenced

within four years from the actual breach. N.Y. Uniform Commercial Code § 2-725 (McKinney 2019).

Article 2 of the UCC applies to "transactions in goods." N.Y. Commercial Code § 2-102 (McKinney 2019). Under the UCC, "goods" are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.* § 2-105. "'Identification of goods occurs when existing goods are designated, or agreed upon, as the goods to which the contract refers.'" *Hudson Energy Services, LLC. v. Great Atlantic & Pacific Tea Co., Inc. (In re Great Atlantic & Pacific Tea Co., Inc)*, 538 B.R. 666, 672 (S.D.N.Y. 2015) (quoting *In re Erving Indus., Inc.*, 432 B.R. 354, 370 (Bankr. Mass. 2010); 2 Anderson U.C.C. § 2–501:4, at 734 (3d ed. 2004)). The Debtors have admitted that certain agreements between them and Pepsi were contracts for the sale of goods. (*See, e.g.*, SAC, ¶ 2 (stating that the Debtors "continued to purchase goods from Defendants Bottling Group and Frito-Lay . . . as they had done in the past")).

In this Case, filed on April 16, 2018, the Debtors seek recovery on express and implied contracts, some of which may be for the purchase and sale of goods manufactured by Pepsi (SAC, Counts Five, Eight, Seventeen, and Twenty-Three); unjust enrichment (SAC, Counts Six, Nine, Eighteen, and Twenty-Four); and promissory estoppel (SAC, Counts Seven, Ten, Nineteen, and Twenty-Five) based on transactions or events dating back almost eight years. (*See, e.g.*, SAC, ¶ 40 ("the Promotion Defendants continued to run Promotions at GAPT's stores between December 24, 2010 and the date the last of the GAPT stores were closed in 2015"), ¶ 43 ("From and after December 24, 2010, Promotion Transactions . . . between GAPT and the Promotion Defendants were evidenced and memorialized by Deal Sheets, Deal Histories, Invoices and Account Reports"); ¶ 44 ("At all times following December 24, 2010, Promotions

were initiated by the applicable Promotion Defendant"); ¶ 84 ("Between December 24, 2010 and November 25, 2015, Defendant Frito-Lay initiated numerous Promotions with GAPT by making offers electronically to GAPT through Demandtec via a Deal Sheet") and similar allegations set forth throughout the SAC). Although the Debtors do not refer to specific transactions or events, they seek reimbursement of expenses they incurred in connection with promotions of Pepsi products including "(i) advertising expenses; (ii) expenses incurred in positioning product; and (iii) the loss of margin resulting from discounting prices in connection with a Promotion." (SAC, ¶ 47). The Debtors specifically allege that Pepsi agreed to reimburse them for "any price reductions by GAPT in connection with a Promotion." (*See, e.g.*, SAC ¶ 87). The Debtors loosely allege that Pepsi has failed to pay for additional expenses including: "(i) store set-up; (ii) arranging for advertising; (iii) ***ensuring that sufficient product was stocked at each store participating in the Promotion***; and (iv) ***arranging with the applicable Promotion Defendant to deliver sufficient product to fill shelves and endcaps***." (SAC, ¶ 46 (emphasis added)). The latter two items must have involved the purchase and sale of Pepsi goods even though the Debtors do not identify particular transactions in the SAC.

New York's statutes of limitation serve the objectives of "finality, certainty and predictability." *Ace Sec. Corp. v. DB Structured Prod., Inc.*, 25 N.Y.3d 581, 593 (2017). Therefore, New York has adopted a "bright-line approach" to ascertain accrual dates in breach of contract cases. *Id.* at 593-94. The so-called "discovery rule" does not apply in New York contract cases. *Id.* at 594. Under New York law, the statute of limitations on contract cases begins to run "from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *Id.*; *see also Longo v. KeyBank Nat'l Assoc.*, 357 F.Supp.3d 263, 270 (S.D.N.Y. 2019) (citing *Ace*, 25 N.Y.3d at 593). The same is true for New

York's Statute of Limitations in Contracts for Sale, N.Y. Uniform Commercial Code § 2-725 (McKinney 2019).

The Debtors allege that they participated in promotions of Pepsi products from December 24, 2010 through November 25, 2015. (SAC, ¶ 84). The Debtors also allege that Pepsi continued to pay for promotions at the Debtors' stores as late as January 28, 2016 (SAC, ¶ 51). They then allege that "[b]etween them, the Promotion Defendants currently owe GAPT the aggregate sum of $7,263,739.96 for Promotions conducted at GAPT's stores, most of which were conducted in 2014 and 2015." (SAC, ¶ 52). They elsewhere allege that Pepsi owes "$7,263,739.96 (less any offsets or credits to which they show themselves entitled)." (*See, e.g.*, SAC, ¶ 2).

Although it is impossible to determine from these allegations when the alleged events took place or what precisely the alleged debts are for, it seems clear from the above-cited allegations that the Debtors may seek recovery on causes of action that accrued as far back as December 24, 2010. The Court should enter summary judgment in Pepsi's favor on all claims arising under contracts for sale in Counts Five through Twenty-Five that accrued before April 16, 2014 and all claims in Counts Five through Twenty-Five, not arising under contracts for sale, that accrued before April 16, 2012.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment should be granted in Pepsi's favor on Counts One through Four of the Debtors' Second Amended Complaint. Partial summary judgment should be granted on all claims arising under contracts for sale in Counts Five through Twenty-Five that accrued before April 16, 2014 and all claims in Counts Five through Twenty-Five, not arising under contracts for sale, that accrued before April 16, 2012.

Dated: October 4, 2019                    Respectfully submitted,

                                          /s/ Jeffrey Chubak
                                          Jeffrey Chubak
                                          STORCH AMINI PC
                                          140 East 4th Street, 25th Floor
                                          New York, New York 10017
                                          (212) 490-4100
                                          jchubak@storchamini.com

                                          - and -

                                          Joseph D. Frank (admitted pro hac vice)
                                          Jeremy C. Kleinman (admitted pro hac vice)
                                          FRANKGECKER LLP
                                          1327 West Washington Blvd., Ste. 5G-H
                                          Chicago, Illinois 60607
                                          (312) 276-1400
                                          jfrank@fgllp.com
                                          jkleinman@fgllp.com

                                          *Attorneys for the Defendants*